UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SHAWN RUSSELL SORENSEN,<br><br>Movant,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | 4:19-CV-04190-KES<br><br><br>REPORT AND RECOMMENDATION |

This matter is before the court on Shawn Russell Sorensen's

motion to vacate, correct, or set aside his sentence pursuant to 28 U.S.C.

§ 2255.  See Docket No. 1.[1]  Respondent the United States of America

("government"), moves to dismiss Mr. Sorensen's § 2255 petition without

holding an evidentiary hearing.  See Docket No. 26.  Mr. Sorensen resists

the motion.  See Docket No. 35.  Mr. Sorensen's case was referred to this

magistrate judge for a recommended disposition pursuant to 28 U.S.C.

§ 636(b)(1)(A) and (B) and pursuant to the October 16, 2014, standing

order of the Honorable Karen E. Schreier, United States District Judge.

---

[1] In this opinion, the court cites to documents filed in this civil habeas
case by simply citing the docket number of the document.  The court
cites to documents in Mr. Sorenson's underlying criminal case, United
States v. Sorensen, 4:16-cr-40062 (D.S.D.), by citing to the docket
number in the criminal case preceded by "CR."

## FACTS

### A.    Proceedings in the District Court

Mr. Sorensen was indicted by a federal grand jury in the District of

South Dakota on May 10, 2016, and charged with conspiracy to

distribute 500 grams or more of a mixture or substance containing

methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  A

superseding indictment was filed on September 20, 2016, which added a

count to the indictment charging Mr. Sorensen with one count of

possessing a firearm after having been convicted of  a felony, in violation

of 18 U.S.C. § 922(g)(1).  See CR Docket No. 70.  Gayle Hartz was named

as Mr. Sorensen's co-conspirator in count 1 of both charging documents.

Attorney Clint Sargent was appointed to represent Mr. Sorensen at

his initial appearance on May 23, 2016.  See CR Docket No. 18.

Thereafter, on June 2-3, 2016, Mr. Sargent withdrew because

Mr. Sorensen retained private counsel, attorneys Rick Ramstad, Bruce

Rivers, and Coley Grostyan.  See CR Docket Nos. 36, 37, 39, 40, 41, and

89.  The Supreme Court's opinion in Mathis v. United States, ___ U.S.

___, 136 S. Ct. 2243 (2016), discussed at length in the DISCUSSION section

of this opinion, was decided on June 23, 2016, shortly after

Mr. Sorenson's replacement counsel made their initial notice

of appearance.

On September 16, 2016, the government filed an information and

notice pursuant to 21 U.S.C. § 851 of its intent to seek an increased

punishment based on Mr. Sorensen's prior convictions for felony drug offenses pursuant to 21 U.S.C. § 841(b)(1)(A), as defined in 21 U.S.C. § 802(44).  The government notified Mr. Sorensen that those convictions were: (1) a conviction that occurred on December 2, 2002, in the Second Judicial Circuit, Minnehaha County, South Dakota, for possession of a controlled substance; and (2) a conviction that occurred on March 10, 2008, in the Superior Court for Mojave County, Arizona, for transporting or selling a dangerous drug.  <u>See</u> CR Docket No. 66.  After Mr. Sorensen was convicted, but before sentencing, the government filed an amended information to correct/clarify that the Arizona conviction was for possession, rather than transportation or sale, of a dangerous drug.  <u>See</u> CR Docket No. 143.  At sentencing, the district court, the Honorable Karen E. Schreier, determined that the amended information permissibly and timely corrected "clerical mistakes" pursuant to 21 U.S.C. § 851(a)(1).  <u>See</u> CR Docket No. 157, pp. 5-7 (sentencing transcript) (hereinafter "ST").

Mr. Sorenson's co-defendant, Ms. Hartz, entered into a plea agreement before trial.  <u>See</u> CR Docket No. 67.  Mr. Sorensen proceeded to a jury trial on October 4, 5 and 6, 2016.  <u>See</u> CR Docket No. 137 (hereinafter "TT").  At trial, twenty-two witnesses testified for the government including Ms. Hartz.  <u>See</u> TT, pp. 254-90.

At trial, the evidence established the following:[2]  On April 25, 2016, a United States Postal Inspector in Minneapolis applied for and received a search warrant for a package sent from a post office in Arizona, addressed to "Gail Hartz, 404 S. Donaldson, Luvern [sic], Minn. 56156." A certified drug dog alerted to the odor of narcotics.  The return label on the package read, "Dave Beckman, 13580 W. Port Royale, Suprise [sic], AZ, 85379."  Upon searching the package pursuant to the warrant, the postal inspector found clothing, toilet paper, paper towels, 192 grams of cocaine, and over four kilograms of methamphetamine wrapped in bundles of plastic and black electrical tape.  The postal inspector contacted a counterpart in Sioux Falls, South Dakota, which is very near Luverne, Minnesota, and requested that he conduct a controlled delivery of the package, which the Sioux Falls inspector did.

Before the package was delivered to Ms. Hartz's home, an anticipatory search warrant was granted for her home and her person. After the controlled delivery to her home in Luverne, Minnesota, officers observed a vehicle drive away from Ms. Hartz's home.  An officer stopped the vehicle and arrested the driver, who was Ms. Hartz.  Meanwhile other officers executed the warrant to search Ms. Hartz's home, and located

---

[2] These are the facts almost verbatim as they were recited in the BACKGROUND section of the Eighth Circuit opinion on Mr. Sorensen's direct appeal, United States v. Sorensen. 893 F.3d 1060, 1063-64 (8th Cir. 2018).  In his § 2255 motion and supporting brief, Mr. Sorensen contests that court's legal conclusions, but he has not contested the accuracy of the background facts as recited in the opinion.

the unopened delivered package.  Ms. Hartz informed the officers she had

received the package on behalf of Shawn Sorensen.  Ms. Hartz had

communicated with Mr. Sorensen via text message prior to its delivery.

Just after the package was delivered, Ms. Hartz texted Mr. Sorensen,

stating, "[i]ts here.  So get ur butt here."  Mr. Sorensen replied, "I'm on

my way."

  The Minnesota agents informed members of the Sioux Falls Area

Drug Task Force (SFADTF) about Mr. Sorensen's involvement.  SFADTF

began conducting surveillance at Mr. Sorensen's residence in Sioux

Falls.  The SDADTF and Minnesota authorities cooperated to follow

Mr. Sorensen from his home in Sioux Falls to Ms. Hartz's home in

Luverne, Minnesota.  Officers arrested Mr. Sorensen immediately upon

his entrance into Ms. Hartz's home in Luverne.

  After his arrest, officers found $15,700 in cash in Mr. Sorensen's

pocket.  A search warrant of Mr. Sorensen's Sioux Falls home yielded

methamphetamine, drug paraphernalia, and a USPS mailing label for

what appeared to be a different package Mr. Sorensen had mailed to

Ms. Hartz on September 21, 2015.  That label's return address was also

"Dave Beckman" in Phoenix, Arizona.  A search warrant was also

obtained for Mr. Sorensen's vehicle.  That search uncovered

Mr. Sorensen's driver's license, treasury checks addressed to

Mr. Sorensen, four cell phones, methamphetamine, marijuana, cocaine,

and other drug substances, three firearms, drug paraphernalia, and the

USPS package mailing label and printed receipt for the intercepted package.

The inspectors extracted data from two of Mr. Sorensen's cell phones.  The extraction reports and physical examinations showed Mr. Sorensen had "Gayle" saved as a contact in two of the phones which were displayed to the jury at trial.  He saved Ms. Hartz' address under each of the "Gayle" contact listings, and misspelled "Luverne" as "Luvern" just like the label on the intercepted package.  The only other address in each of the phones was the exact return address, including the same misspelling of the City "Surprise" as "Suprise" as it also appeared on the label of the intercepted package.  The inspection of the phones also confirmed the text messages between Ms. Hartz and Mr. Sorensen regarding the intercepted package.

The inspectors also received proof Mr. Sorensen had called the ASK USPS hotline to check the status of the intercepted package. Additionally, the postal inspectors discovered USPS records showing packages sent from Arizona to Ms. Hartz at addresses in Sioux Falls and Luverne on at least six different occasions, and flight records revealing that Mr. Sorensen took flights from Sioux Falls to Phoenix on dates corresponding with delivery of many of the packages.

At the trial, Ms. Hartz provided extensive testimony about her involvement with Mr. Sorensen.  She testified that she met Mr. Sorensen in the early 2000s when she and her boyfriend would consume

6

methamphetamine with Mr. Sorensen and his wife.  Ms. Hartz began to work for Mr. Sorensen in 2014, after she lost her job.  She accepted packages for Mr. Sorensen in exchange for money and drugs.  Ms. Hartz testified she accepted approximately six packages containing methamphetamine for Mr. Sorensen.

A USPS forensic latent print analyst testified about latent prints found on the adhesive side of the packing tape on the intercepted package.  She identified three prints on the tape which matched Mr. Sorensen's known prints.

The jury convicted Mr. Sorensen on both counts of the superseding indictment.  See CR Docket No. 97.  After the trial, but before sentencing, Mr. Sorensen dismissed attorneys Ramstad, Rivers, and Grostyan.  See CR Docket Nos. 108-110.  Mr. Sorensen retained his original attorney, Clint Sargent, to represent him for sentencing.  Id.

On April 25, 2017, the district court sentenced Mr. Sorensen to life in prison for his drug distribution conspiracy conviction, which sentence was mandatory because of the effect of the government's having filed its § 851 information.  See CR Docket No. 148.  The court stated at sentencing that, absent the § 851 information, it probably would not have sentenced Mr. Sorenson to life imprisonment.  See ST (CR Docket No. 157), p. 28.  Without the enhancement, the very bottom of Mr. Sorensen's guideline range would have been 360 months (30 years), which the district court indicated it "probably would" have imposed.  Id.

On count 2 charging possession of a firearm by a prohibited person the district court sentenced Mr. Sorensen to ten years' imprisonment, to be served concurrently with the sentence imposed on count 1.  Id.

## B.    The Direct Appeal

Mr. Sorensen appealed the conviction and sentence.  See CR Docket No. 150.  Attorney Clint Sargent filed the notice of appeal, but Paul Engh, a Minneapolis lawyer, as well as Mr. Sorensen, acting *pro se*, represented Mr. Sorensen throughout the appellate proceedings.  See United States v. Sorensen, 893 F.3d 1060 (8th Cir. 2018).

Mr. Sorensen raised the following issues on appeal: (1) whether the district court erred by failing to *sua sponte* exclude the testimony of the government's fingerprint expert; (2) whether the two prior offenses cited by the government's information/amended information were proper predicate "felony drug offenses" for imposition of an enhanced sentence pursuant to 21 U.S.C. §§ 841(a)(1); 841(b)(1)(A) and 802(44); and (3) whether the life sentence imposed by the district court violated the Eighth Amendment prohibition on cruel and unusual punishment.  See Sorensen, 893 F.3d at 1060-67.  The Eighth Circuit affirmed Mr. Sorensen's convictions and denied each of his claims on the merits. Id.

## C.    Mr. Sorensen's Allegations in his § 2255 Motion

Mr. Sorensen asserts six claims in support of his request for § 2255 relief:

1.   Mr. Sorensen's statutory sentencing range was improperly enhanced to mandatory life under 21 U.S.C. §§ 841(b)(1)(A) and 851.
     a.   Arizona Conviction
     b.   South Dakota Conviction

2.   Trial, sentencing, and appellate counsel were ineffective in failing to challenge whether Mr. Sorensen's South Dakota and Arizona drug convictions qualified as "felony drug offenses" in violation of Mr. Sorensen's Sixth Amendment Rights.

3.   Trial counsel was ineffective in failing to investigate and present at least two defense witnesses in violation of Mr. Sorensen's Sixth Amendment rights.

4.   Trial counsel was ineffective in advising Mr. Sorensen to give up his right to testify on his own behalf in violation of Mr. Sorensen's Sixth Amendment rights.

5.   Mr. Sorensen's life sentence for a drug offense violates his rights under the:
     a.   Equal Protection Clause;
     b.   Eighth Amendment.

6.   Mr. Sorensen's conviction and sentence for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) were imposed in violation of the laws of the United States in light of Rehaif v. United States, 139 S. Ct. 2191 (2019).

The government now moves to dismiss Mr. Sorensen's § 2255 motion, arguing that the above issues were raised and decided on the merits in Mr. Sorensen's direct appeal or, if not raised, that they are now procedurally defaulted and, as to his ineffective assistance claims, that they fail on the merits.

**DISCUSSION**

**A.    Scope and Procedure Applicable to a § 2255 Motion**

Section 2255 of Title 28 of the United States Code was enacted to supersede habeas corpus practice for federal prisoners.  <u>Davis v. United States</u>, 417 U.S. 333, 343-44 (1974).  Section "2255 was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus."  <u>Id.</u> at 343.  Prior to the enactment of § 2255, habeas claims had to be brought in the district where the prisoner was confined, resulting in overburdening those districts where federal correctional institutions were located and presented logistical issues because the record in the underlying criminal case were often in a distant location.  <u>United States v. Hayman</u>, 342 U.S. 205, 212-16 (1952).  The enactment of § 2255 resolved these issues by requiring that the motion be filed in the sentencing court.  <u>Id.</u>

The scope of a § 2255 motion is seemingly broader than the scope of a habeas petition, the latter of which is typically limited to allegations of a constitutional dimension.  Section 2255 allows a federal prisoner to "vacate, set aside or correct" a federal sentence on the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  <u>See</u> 28 U.S.C. § 2255.

Where the allegation for relief is *not* based on a violation of a Constitutional or federal statutory right or an assertion that the court was without jurisdiction, the Supreme Court has read a "fundamentality" requirement into § 2255—relief is available for only those errors which constitute a "fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure." Hill v. United States, 368 U.S. 424, 428 (1962); see Peguero v. United States, 526 U.S. 23, 27-30 (1999).

Generally, petitioners are precluded from asserting claims pursuant to § 2255 that they failed to raise on direct appeal. United States v. Frady, 456 U.S. 152, 167-68 (1982); McNeal v. United States, 249 F.3d 747, 749 (8th Cir. 2001). When a § 2255 petitioner asserts a claim that is procedurally defaulted because it was not raised on direct appeal, the claim can only proceed after the petitioner has shown either: (1) actual innocence or (2) that the procedural default should be excused because there was both cause for the default and actual prejudice to the petitioner. Bousley v. United States, 523 U.S. 614, 621-22 (1998); McNeal, 249 F.3d at 749. Therefore, barring a claim of actual innocence, a petitioner must show both cause for why he failed to raise an issue on direct appeal as well as actual prejudice caused by the alleged errors.

Appellate courts generally refuse to review claims of ineffective assistance of counsel on direct appeal; such claims are, therefore, properly addressed in a 28 U.S.C. § 2255 motion such as the one here.

11

See United States v. Campbell, 764 F.3d 880, 892-93 (8th Cir. 2014);

United States v. Lee, 374 F.3d 637, 654 (8th Cir. 2004) (ineffective

assistance of counsel claims are not generally cognizable on direct appeal

and will be heard only to prevent a miscarriage of justice or in cases

where the district court has developed a record on the issue).  Therefore,

no procedural default analysis applies to petitioner's claim of

constitutionally deficient counsel.

**B.      Standard Applicable to Rule 12(b)(6) Motions**

        The government's motion to dismiss Mr. Sorensen's § 2255 motion

is based on Federal Rule of Civil Procedure 12, specifically parts (b)(6)

and (h)(3) of Rule 12.  See Docket No. 26.  The Federal Rules of Civil

Procedure are applicable to § 2255 habeas actions so long as the

procedural rules do not conflict with the habeas statutes or the Rules

Governing Section 2255 Cases in the United States District Courts

("Governing Rules").  See Governing Rule 12.  Federal Rule of Civil

Procedure 12(b)(6) is not inconsistent with the Governing Rules.

Compare Governing Rules 4 & 5 (allowing respondent to respond to

petitioner's habeas petition with a motion), with FED. R. CIV. P. 12(b)(6)

(same); see also Ebert v. Clarke, 320 F. Supp. 2d 902, 909-10 (D. Neb.

2004) (holding that FED. R. CIV. P. 12(b)(6) applies in habeas

proceedings).

The government invokes Rule 12(h)(3), which allows dismissal for lack of subject matter jurisdiction, but never supports its invocation with any evidence or argument that this court lacks jurisdiction. Indeed, Mr. Sorensen seeks to attack the constitutionality of his conviction and this is the district in which he was sentenced. If *this* court does not have subject matter jurisdiction over Mr. Sorensen's claim, *what court does*? Merely because the government believes Mr. Sorensen is not entitled to habeas relief on the claims he has asserted does not act to deprive this court of the power to hear and decide his claims. The court rejects outright the government's citation to Rule 12(h)(3).

As to Rule 12(b)(6), that provision allows dismissal of a habeas petition if the petitioner has failed to state a claim upon which relief can be granted. See FED. R. CIV. P. 12(b)(6). Petitioners must plead "enough facts to state a claim to relief that is *plausible* on its face." Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (emphasis added).

Under Federal Rule of Civil Procedure 8(a)(2), a petitioner must plead only "a short and plain statement of the claim showing that the pleader is entitled to relief." Id. at 555 (quoting FED. R. CIV. P. 8(a)(2)). A habeas petition does not need "detailed factual allegations" to survive a motion to dismiss, but a petitioner must provide the grounds for his entitlement to relief and cannot merely recite the elements of his cause of action. Id. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). There is also a "plausibility standard" which "requires a [petition] with

13

enough factual matter (taken as true)" to support the conclusion that the petitioner has a valid claim. Id. at 556. The petitioner's complaint must contain sufficiently specific factual allegations in order to cross the line between "possibility" and "plausibility" of entitlement to relief. Id.

There are two "working principles" that apply to Rule 12(b)(6) motions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). First, courts are not required to accept as true legal conclusions "couched as factual allegation[s]" contained in a petition. Id. (quoting Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Rule 8 "does not unlock the doors of discovery for a [petitioner] armed with nothing more than conclusions." Id. at 678-79.

Second, the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679 (citing decision below Iqbal v. Hasty, 490 F.3d 143, 157-158 (2d Cir. 2007)). Where the petitioner's allegations are merely conclusory, the court may not infer more than the mere possibility of misconduct, and the petitioner has *alleged*—but has not "show[n]"—that he is entitled to relief as required by Rule 8(a)(2). Iqbal, 556 U.S. at 679 (emphasis added).

The Court explained that a reviewing court should begin by identifying statements in the petition that are conclusory and therefore

not entitled to the presumption of truth.  Id. at 679-80.  Legal conclusions must be supported by factual allegations demonstrating the grounds for a petitioner's entitlement to relief.  Id. at 679; Twombly, 550 U.S. at 555; FED. R. CIV. P. 8(a)(2).  A court should assume the truth only of "well-pleaded factual allegations," and then may proceed to determine whether the allegations "plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.  These are the principles guiding the court's evaluation of respondent's motion.

Rule 12(b)(6) requires the court to evaluate the sufficiency of a petitioner's pleading of a claim by examining his or her petition.  See FED. R. CIV. P. 12(b)(6); Iqbal, 556 U.S. at 679.  Courts evaluating a Rule 12(b)(6) motion are not strictly limited to evaluating the petition alone, however.  Dittmer Properties, L.P. v. F.D.I.C., 708 F.3d 1011, 1021 (8th Cir. 2013).  They may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned."  Id. (quoting Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 931 n.3 (8th Cir. 2012) (quoting 5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRACTICE & PROCEDURE § 1357 (3d ed. 2004))).

When a respondent files a response to a § 2255 action, whether it be an answer or a motion to dismiss, the respondent is directed to attach any transcripts or other records the respondent considers to be relevant

15

and which are not available in the court's records.  See Governing Rule 5(c).  In addition, Rule 4 specifically directs the court to examine the record of prior proceedings in that court.  See Governing Rule 4(b).  The government has also supplied the court with affidavits from Sorensen's former trial counsel addressing some of Mr. Sorensen's allegations of ineffective assistance claims.  See Docket Nos. 23 and 24.

In addition, the court considers the entire record in Mr. Sorensen's underlying criminal case.  Because these documents are required by Governing Rule 5(c), and because these documents are of the type which the court would be allowed to judicially notice, the court considers these documents in ruling on respondents' Rule 12(b)(6) motion.  Dittmer Properties, L.P., 708 F.3d at 1021; FED. R. EVID. 201(b); Governing Rule 5(c).

## C.  Whether Mr. Sorensen's Sentencing Range Was Improperly Enhanced to Mandatory Life under 21 U.S.C. §§ 841(b)(1)(A) and 851.

Mr. Sorensen asserts his sentence was improperly enhanced by both his Arizona conviction and his South Dakota conviction.  He asserts that neither prior conviction constitute a proper predicate offense under 21 U.S.C. §§ 841(b)(1)(A) and 802(44).

### 1.  Arizona Conviction

On direct appeal, Mr. Sorensen challenged the validity of the Arizona conviction as a predicate offense.  Sorensen, 893 F.3d at 1066-67.  The basis of Mr. Sorensen's challenge to the Arizona conviction

16

on direct appeal was the sufficiency of the information the government filed pursuant to 21 U.S.C. § 851(a), and whether the government had complied with the notice requirements of that statute.  Id.

The court found the government filed the amended information after conviction, but before sentencing.  Id.  The initial information erroneously listed the Arizona conviction as one of *transporting or selling* when in fact it was for *possession.*  Id. at 1067.  But the initial information correctly identified the state and county of conviction, and the exact date of the conviction.  Id.  Thus, the court found, the initial information filed by the government gave reasonable notice of the government's intent to rely on that particular conviction.  Id.

The second information, filed after conviction but before sentencing, corrected the error of "transporting or selling" to "possession" for the Arizona conviction.  Id.  Though 21 U.S.C. § 851(a) states clerical errors may be amended any time before pronouncement of the sentence, the statute does not define the meaning of the term "clerical errors."  The court, however, explained that an amendment merely corrects a clerical error "where the government's initial information still gave the defendant reasonable notice of the government's intent to rely on a particular conviction."  Id. at 1066-67 (cleaned up).  Because the government's initial information did so in this case, the court found the Arizona conviction was properly used to enhance Mr. Sorensen's sentence.  Id. at 1067.

In this § 2255 proceeding, Mr. Sorensen again claims his Arizona conviction was improperly used to enhance his sentence.  To the extent he makes the same general claim that his Arizona conviction was improperly used to enhance his conviction, that general claim is barred because it was already made and rejected on direct appeal.  Sun Bear v. United States, 644 F.3d 700, 702 (8th Cir. 2011).

In this § 2255 proceeding, however, Mr. Sorensen also makes a new argument about why the Arizona conviction was improperly used to enhance his sentence.  Mr. Sorensen asserts that because the Arizona conviction arose under a state statute that is overbroad and indivisible, the 2008 Arizona conviction does not qualify as a "felony drug offense."  See Docket No. 2, p. 3.  Because this new argument was not made on direct appeal, it is procedurally defaulted unless Mr. Sorensen shows (1) cause for the default and prejudice as a result of the issue not being raised or (2) a fundamental miscarriage of justice.  Bousley, 523 U.S. at 622.  The "cause" Mr. Sorensen alleges is that his trial, sentencing, and appellate counsel were ineffective for failing to raise this argument.

If Mr. Sorenson can show his counsel were ineffective, this would constitute a sufficient showing of the "cause" prong of cause and prejudice.  Becht v. United States, 403 F.3d 541, 545 (8th Cir. 2005); Boysiewick v. Schriro, 179 F.3d 616, 619 (8th Cir. 1999).  Prejudice would be inherent in the increase of Mr. Sorenson's sentence to

18

mandatory life imprisonment. For this reason, the court examines the merits of Mr. Sorensen's claim as to the Arizona conviction.

### a.    Mathis v. United States

In Mathis v. United States, Mathis' sentence for unlawful possession of a firearm was enhanced under the Armed Career Criminal Act (ACCA) because he had three prior convictions for a violent felony, including an Iowa conviction for "burglary." Mathis, 136 S. Ct. at 2246-47. Settled law established that a prior state court conviction for burglary qualified as a burglary under the ACCA for purposes of enhancing a federal defendant's sentence "if, but only if, its elements are the same as, or narrower than, those of the generic offense" of burglary. Id. at 2247. Settled law also established that generic burglary meant a crime containing "the following elements: an unlawful or unprivileged entry into . . . a building or other structure, with intent to commit a crime." Id. at 2248.

The Court explained that, to determine whether a prior conviction for burglary fits the definition of generic burglary under the ACCA, "courts apply . . . the categorical approach: They focus solely on whether the elements of the crime of conviction sufficiently match the elements of generic burglary, while ignoring the particular facts of the case." Id. Distinguishing between elements of an offense and facts is central to the determination. Id.

19

"Elements are the constituent parts of a crime's legal definition—
the things the prosecution must prove to sustain a conviction." Id.
(cleaned up).  Elements must be proven beyond a reasonable doubt and
found by a jury in order to convict the defendant.  Id.  At a plea hearing,
the defendant must admit each element in order for the plea to be valid.
Id.

Facts, sometimes called "brute facts," by contrast, are
"circumstances or events having no legal effect or consequence." Id.
(cleaned up).  They do not have to be "found by a jury nor admitted by a
defendant." Id.  Another term used to describe facts are "means," or
"mere means."

Under the categorical approach, if the crime of conviction has
*elements* that are the same as or narrower than the generic offense, it
counts as a valid "crime of violence" under the ACCA.  Id.  But if the
elements of the crime of conviction include conduct broader than the
generic offense, it is not a qualifying prior conviction for purposes of
sentence enhancement under the ACCA.  Id.  Under the categorical
approach, courts are limited to comparing the elements of the offense of
conviction—without regard to the facts or means of the crime—with the
elements of the generic offense, in Mathis' case, burglary.  Id.  Thus, if
the *elements* of the conviction are broader than the elements of generic
burglary, the conviction cannot constitute a "crime of violence" under the

20

ACCA, even if the actual facts of the defendant's crime of conviction *would* fit within the definition of generic burglary.  Id. at 2248-49.

The Court noted it had allowed a modified categorical approach allowing the sentencing court to look to a limited list of sources relevant to the crime of conviction if a statute had a "divisible structure." Id. at 2249.  A statute with a divisible structure is one that "list[s] elements in the alternative, and thereby define[s] multiple crimes." Id.  Under these circumstances, the sentencing court may look to the indictment, jury instructions or the plea to determine which of the alternative substantive crimes the defendant was actually convicted of.  Id.  But the modified categorical approach is only applicable where a statute contains an alternative list of *elements*.  It cannot be applied to a statute that lists alternative *means*.

In Mathis' case, he had a prior Iowa conviction for burglary which covered conduct broader than that covered by generic burglary—in addition to criminalizing unlawful entry into a building or other structure like generic burglary, the Iowa statute also made it a crime to enter "vehicle[s]," which was a location not covered by generic burglary.  Id. at 2250.  The Court, with reference to Iowa state court opinions, held that the statute defined one crime, with one set of elements, while specifying multiple factual means of satisfying the locational element, only some of which were congruent with the elements of generic burglary.  Id.

21

The district court had looked to Mathis' underlying conviction documents and determined he had actually burgled a structure.  Id.  The court then applied the ACCA enhancement based on looking behind the elements of the state offense and examining state court documents that described Mathis' actual actions.  Id.  The Eighth Circuit affirmed, holding that whether a statute delineated alternative means of committing a crime, or alternative elements, either circumstance would permit the sentencing court to "look behind" the statute itself and examine old record materials to determine what conduct the defendant had actually engaged in that was the basis of his conviction.  Id.  The Supreme Court reversed.  Id. at 2253.

The Court stated it had "often held, and in no uncertain terms, that a state crime cannot qualify as an ACCA predicate if its elements are broader than those of a listed generic offense."  Id. at 2251.  How a defendant actually committed the crime is not relevant.  Id.  That rule, the Court emphasized, applies whether the statute set forth a single means of committing the crime, or several alternative possible means of commission.  Id.  The state legislature's prerogative to list alternative means in a single statute "gives a sentencing court no special warrant to explore the facts of an offense, rather than to determine the crime's elements and compare them with the generic definition."  Id.

The Court held that the modified categorical approach serves "solely" to "identify the elements of the crime of conviction when a

statute's disjunctive phrasing renders one (or more) of [the elements] opaque." Id. at 2253.  Lower courts are not allowed to repurpose the modified categorical approach to discover whether the *facts* of a defendant's prior conviction would match the generic definition under the ACCA.  Id. at 2254.

The Mathis Court's exasperation with lower courts improperly trying to evade applying the categorical approach's comparison of elements only is palpable in the opinion.  The Court stated its holding had been the law for more than a quarter of a century.  Id. at 2251 (citing Taylor v. United States, 495 U.S. 575, 601 (1990)).  The Court stated Taylor's holding "became a mantra in our subsequent" decisions. Id.  The Court stated it had "held, over and over" that courts are to compare elements only and disregard specific facts of a crime.  Id. at 2257.  "At the risk of repetition (perhaps downright tedium)," the court laid out examples from its recent opinions:

> --the ACCA "refers to predicate offenses in terms not of prior conduct but of prior 'convictions' and the 'element[s]' of crimes." Shepard v. United States, 544 U.S. 13, 19 (2005).
>
> --"[W]e have avoided any inquiry into the underlying facts of [the defendant's] particular offense, and have looked solely to the elements of [burglary] as defined by [state] law." James v. United States, 550 U.S. 192, 214 (2007).
>
> --"[W]e consider [only] the *elements of the offense* [,] without inquiring into the specific conduct of this particular offender." Sykes v. United States, 564 U.S. 1, 7 (2011).
>
> --"The key [under ACCA] is elements, not facts." Descamps v. United States, 570 U.S. 254, 261 (2013).

23

Mathis, 136 S. Ct. at 2251-52.

Further, the Mathis Court emphasized it has hewed to the same precedent in cases outside the ACCA, such as in immigration cases, where it has stated a sentencing judge must look at the "formal element[s] of a conviction[,] rather than to the specific facts underlying the crime," in deciding whether to deport an alien for having a prior conviction for an "aggravated felony." Id. at 2251-52 n.2 (quoting Kawashima v. Holder, 565 U.S. 478, 482-83 (2012)).

The Court articulated three reasons in support of its precedent. Id. at 2252. First, Congress intended application of the categorical approach by using the language "previous convictions" instead of "an offense committed." Id. This legislative choice of words, the Court held, indicated sentencing courts should only ask whether "the defendant had been convicted of crimes falling within certain categories," and not ask about the specific facts behind a conviction. Id.

Second, the Court in Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), held that the Sixth Amendment forbids sentencing courts from finding facts that served to increase a defendant's punishment, except for finding "the simple fact of a prior conviction." Id. That means a sentencing court may only look to the elements of the statute of conviction, it cannot scour through the defendant's underlying state file trying to "find facts" which would place the defendant within the ACCA's definition of generic burglary and thereby increase his punishment. Id.

24

Third, statements of facts in an underlying record, the proof of which are unnecessary to the establishment that a crime has been committed, are unreliable. Id. at 2253. Because the facts are not required for conviction, at a trial and, even more, at a plea hearing, a defendant may have zero incentive to contest facts which do not affect the outcome of his case, and he may even be precluded from doing so by the court.[3] Id. at 2253. Furthermore, a prosecutor or judge's inaccurate statement of means (as opposed to elements) are likely to go uncorrected. Id. Parties have little incentive to pursue an appeal issue that will not affect the outcome of the case. Id.

The Court concluded by stating that Congress' use of the term "convictions" in the ACCA still supports an elements-based inquiry and "directly refutes" a fact-based approach. Id. The Court stated its decision in Descamps "made clear that when the Court had earlier said (and said and said) 'elements,' it meant just that"; it did not mean "means." Id. at 2255.

It is the Mathis decision and its progeny that the court must apply to Mr. Sorenson's claim.

---

[3] Remember, the Mathis Court was construing a statute which listed alternative *means* of committing the crime of burglary, *not* alternative *elements*. The whole question was whether the modified categorical approach could be applied when the alternatively listed things were means, not elements. Mathis, 136 S. Ct. at 2253.

### b.    Cause—Ineffective Assistance

The government urges the court not to reach the merits of Mr. Sorenson's argument as to his Arizona conviction because the argument was "novel" and, therefore, cannot constitute ineffective assistance of counsel.

The Sixth Amendment of the Constitution of the United States affords a criminal defendant with the right to assistance of counsel.  U.S. Const. amend. VI.  The Supreme Court "has recognized that 'the right to counsel is the right to the effective assistance of counsel.' " Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771, n.14 (1970)).  Strickland is the benchmark case for determining if counsel's assistance was so defective as to violate a criminal defendant's Sixth Amendment rights and require reversal of a conviction.  Id. at 687.  "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88.  The defendant must also show that counsel's unreasonable errors or deficiencies prejudiced the defense and affected the judgment.  Id. at 691.  The defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.  In sum, a defendant must satisfy the following two-prong test.  Id. at 687.

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made

26

errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id.

"There is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir. 2002).  It is the petitioner's burden to overcome this presumption, and a "petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." Id.

Counsel's conduct must be judged by the standards for legal representation which existed at the time of the representation, not by standards promulgated after the representation.  Bobby v. Van Hook, 558 U.S. 4, 7-9 (2009).  American Bar Association standards and similar directives to lawyers are only guides as to what reasonableness of counsel's conduct is, they are not its definitive definition.  Id.  The Supreme Court distinguishes between those cases in which the new evidence "would barely have altered the sentencing profile presented to the sentencing judge," and those that would have had a reasonable

27

probability of changing the result.  Porter v. McCollum, 558 U.S. 30, 41 (2009).

In assessing the prejudice prong, it is important for courts to consider " 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'— and 'reweig[h] it against the evidence in aggravation.' " Id. at 41 (quoting Williams v. Taylor, 529 U.S. 362, 397-98 (2000)).  It is not necessary for the petitioner to show "that counsel's deficient conduct more likely than not altered the outcome" of his case, only that there is "a probability sufficient to undermine confidence in [that] outcome." Id. at 44.  Judicial scrutiny of attorney performance is highly deferential, with a strong presumption that counsel's conduct falls within the range of reasonable professional conduct.  Strickland, 466 U.S. at 698.

A counsel's failure to raise a novel argument or an issue of unsettled law does not render his performance constitutionally ineffective.  Basham v. United States, 811 F.3d 1026, 1029 (8th Cir. 2016); New v. United States, 652 F.3d 949, 952 (8th Cir. 2011); Anderson v. United States, 393 F.3d 749, 754 (8th Cir. 2005).  Even where an issue is percolating in the lower courts, or where a split of authority exists among the courts, counsel's performance "falls within the wide range of professionally competent assistance" if such an issue is not raised.  Basham, 811 F.3d at 1029; Fields v. United States, 201 F.3d 1025, 1027-28 (8th Cir. 2000).

28

Here, the court concludes the issue of whether Mr. Sorenson's previous conviction in Arizona could be used to enhance his federal drug sentence was not a novel or new issue. As the Supreme Court pointed out in <u>Mathis</u>, the rule "announced" in <u>Mathis</u> had been the law for 25 years, since the Court decided <u>Taylor</u>. Furthermore, the issue did not lie latent for 25 years; it was affirmed again and again by the Supreme Court. Furthermore, the <u>Mathis</u> decision itself was decided three months before the government filed its § 851 information in Mr. Sorenson's case. <u>Mathis</u> was the law of the land 10 months before Mr. Sorenson's sentencing.

Counsel, both trial and appellate, had ample time to take note of the <u>Mathis</u> decision and apply it to Mr. Sorenson's case. The government obtained and filed affidavits from two of Mr. Sorenson's lawyers, Bruce Michael Rivers and Coley Grostyan. <u>See</u> Docket Nos. 23 & 24. Neither of these affidavits address the <u>Mathis</u> issue. Counsel do not discuss in these affidavits whether they considered attacking the convictions listed in the § 851 information. The government did not obtain affidavits from Mr. Sorenson's local counsel, Rick Ramstad or Clint Sargent, who handled Mr. Sorenson's sentencing hearing. No affidavit appears in the record from Mr. Sorenson's appellate counsel, Paul Engh, addressing whether the <u>Mathis</u> issue was considered on appeal.

At this procedural posture of Mr. Sorenson's case, the court does not definitively decide whether he merits habeas relief. The court decides

only whether there is no plausible scenario given the facts pleaded that
Mr. Sorenson can obtain relief.  The court concludes there is plausible
evidence of ineffective assistance of counsel and, for purposes of the
government's Rule 12(b)(6) motion, the court finds Mr. Sorenson has met
his burden to show cause and allow his case to progress.  Evidence
should be received at a hearing to further flesh out this issue, including
evidence from lawyers who represented Mr. Sorenson at sentencing and
on appeal.

<strong>c.      The Merits of the Arizona Conviction</strong>

If the law precludes relief altogether in Mr. Sorenson's case, then
the court would be required to grant the government's Rule 12(b)(6)
motion regardless of what trial counsel and appellate counsel's testimony
would be.  Accordingly, the court examines the merits of Mr. Sorenson's
claim.

A "felony drug offense" pursuant to 21 U.S.C. §§ 841(b)(1)(A) and
802(44) is a conviction that "is punishable by imprisonment for more
than one year under any law of the United States or of a state or foreign
country that prohibits or restricts conduct relating to narcotic drugs,
marihuana, anabolic steroids, or depressant or stimulant substances."
Id.  21 U.S.C. § 802(44).

In Mr. Sorensen's 2008 Arizona conviction, Mr. Sorensen pleaded
guilty to possession of dangerous drugs (methamphetamine), a class 4
felony, in violation of ARS §§ 13-3407, 13-3401, 13-701, and 13-801.

30

<u>See</u> Docket No. 2-1.  He received a stipulated three-year prison sentence

for this conviction.  <u>Id.</u>  The relevant portions of those statutes as they

were in January, 2008, at the time of Mr. Sorensen's Arizona conviction,

are:[4]

> **ARS 13-3407  Possession, use, administration, acquisition, sale, manufacture, or transportation of dangerous drugs; classification**
>
> A.   A person shall not knowingly:
>
> > 1.   Possess or use a dangerous drug.
> >
> > 2.   Possess a dangerous drug for sale.
> >
> > 3.   Possess equipment or chemicals, or both, for the purpose of manufacturing a dangerous drug.
> >
> > 4.   Manufacture a dangerous drug.
> >
> > 5.   Administer a dangerous drug to another person.
> >
> > 6.   Obtain or procure the administration of a dangerous drug by fraud, deceit, misrepresentation or subterfuge.
> >
> > 7.   Transport for sale, import into this state or offer to transport for sale or import into this state, sell, transfer or offer to sell or transfer a dangerous drug.
>
> B.   A person who violates:
>
> > 1.   Subsection A, paragraph 1 of this section is guilty of a class 4 felony.  Unless the drug involved is lysergic acid diethylamide, methamphetamine, amphetamine or phencyclidine or the person was

---

[4] ARS 13-3401 is the "definitions" portion of the statute of conviction.  It is very lengthy and the parties do not contest that methamphetamine is contained within the definition of a "dangerous drug."  The court therefore does not reproduce this statute.

previously convicted of a felony offense or a violation of this section or § 13-3408 , the court on motion of the state, considering the nature and circumstances of the offense, for a person not previously convicted of any felony offense or a violation of this section or § 13-3408 may enter judgment of conviction for a class 1 misdemeanor and make disposition accordingly or may place the defendant on probation in accordance with chapter 9 of this title 1 and refrain from designating the offense as a felony or misdemeanor until the probation is successfully terminated.  The offense shall be treated as a felony for all purposes until the court enters an order designating the offense a misdemeanor.

2.  Subsection A, paragraph 2 of this section is guilty of a class 2 felony.

3.  Subsection A, paragraph 3 of this section is guilty of a class 3 felony, except that if the offense involved methamphetamine, the person is guilty of a class 2 felony.

4.  Subsection A, paragraph 4 of this section is guilty of a class 2 felony.

5.  Subsection A, paragraph 5 of this section is guilty of a class 2 felony.

6.  Subsection A, paragraph 6 of this section is guilty of a class 3 felony.

7.  Subsection A, paragraph 7 of this section is guilty of a class 2 felony.

C.  Except as provided in subsection E of this section, a person who is convicted of a violation of subsection A, paragraph 1, 3 or 6 and who has not previously been convicted of any felony or who has not been sentenced pursuant to § 13-604 or any other law making them a convicted person ineligible for probation is eligible for probation.

D.  Except as provided in subsection E of this section, if the aggregate amount of dangerous drugs involved in

32

one offense or all of the offenses that are consolidated for trial equals or exceeds the statutory threshold amount, a person who is convicted of a violation of subsection A, paragraph 2, 5 or 7 of this section is not eligible for suspension of sentence, probation, pardon or release from confinement on any basis until the person has served the sentence imposed by the court, the person is eligible for release pursuant to § 41-1604.07 or the sentence is commuted.

E.   If the person is convicted of a violation of subsection A, paragraph 4 of this section or subsection  A, paragraph 2, 3, or 7 of this section and the drug involved is methamphetamine, the person shall be sentenced pursuant to § 13-712.

F.   A person who is convicted of a violation of subsection A, paragraph 4 of this section or subsection A, paragraph 2, 3 or 7 of this section involving methamphetamine is not eligible for suspension of sentence, probation, pardon or release from confinement on any basis until the person has served the sentence imposed by the court, the person is eligible for release pursuant to § 41-1604.07 or the sentence is commuted.

G.   If a person is convicted of a violation of subsection A, paragraph 5 of this section, if the drug is administered without the other person's consent, if the other person is under eighteen years of age and if the drug is flunitrazepam, gamma hydroxy butrate or ketamine hydrochloride, the convicted person is not eligible for suspension of sentence, probation, pardon or release from confinement on any basis until the person has served the sentence imposed by the court, the person is eligible for release pursuant to § 41-1604.07 or the sentence is commuted.

H.   In addition to any other penalty prescribed by this title, the court shall order a person who is convicted of a violation of this section to pay a fine of not less than one thousand dollars or three times the value as determined by the court of the dangerous drugs involved in or giving rise to the charge, whichever is greater, and not more than the maximum authorized by chapter 8 of this title.  A judge shall not suspend

33

any part or all of the imposition of any fine required by this subsection.

I.   A person who is convicted of a violation of this section for which probation or release before the expiration of the sentence imposed by the court is authorized is prohibited from using any marijuana, dangerous drug, narcotic drug or prescription-only drug except as lawfully administered by a health care practitioner and as a condition of any probation or release shall be required to submit to drug testing administered under the supervision of the probation department of the county or the state department of corrections, as appropriate, during the duration of the term of probation or before the expiration of the sentence imposed.

J.   If a person who is convicted of a violation of this section is granted probation, the court shall order that as a condition of probation the person perform not less than three hundred sixty hours of community restitution with an agency or organization that provides counseling, rehabilitation or treatment for alcohol or drug abuse, an agency or organization that provides medical treatment to persons who abuse controlled substances, an agency or organization that serves persons who are victims of crime or any other appropriate agency or organization.

## ARS 13-701 Sentence of Imprisonment for felony; presentence report.

A.   Sentence of imprisonment for a felony shall be a definite term of years and the person sentenced, unless otherwise provided by law, shall be committed to the custody of the state department of corrections.

B.   No prisoner may be transferred to the custody of the state department of corrections without a certified copy of the judgment and sentence, signed by the sentencing judge, and a copy of the recent presentence investigation report unless the court has waived preparation of the report.

C. Except as provided in § 13-604 the term of imprisonment for a felony shall be determined as follows for a first time offense:

    1. For a class 2 felony, five years.

    2. For a class 3 felony, three and one-half years.

    3. For a class 4 felony, two and one-half years.

    4. For a class 5 felony, one and one-half years.

    5. For a class 6 felony, one year.

**ARS 134-801 Fines for Felonies**

A. A sentence to pay a fine for a felony shall be a sentence to pay an amount fixed by the court not more than one hundred fifty thousand dollars.

B. A judgment that the defendant shall pay fine, with or without the alternative of imprisonment, shall constitute a lien in like manner as a judgment for money rendered in a civil action.

C. This section does not apply to an enterprise.

Mathis teaches that the first task a court must engage in is to determine whether a state statute of conviction containing alternatively phrased items lists separate *elements* of a crime, or merely lists different *means* of committing a crime. Mathis, 136 S. Ct. at 2256. If the statute lists alternative *means* of committing the crime, the court must apply the categorical approach and look to the elements of the state crime and compare them with the federal crime. In the context of a § 851 information, the appropriate comparison is whether the state statute criminalizes possession, distribution, or ingestion of drugs more broadly than the federal drug statutes do.

35

Mr. Sorensen asserts, and the government does not dispute, there are at least two drugs listed in Arizona's schedule of "dangerous drugs" that are not listed in the drugs defined by the federal schedule of drugs covered by 21 U.S.C. § 802(44) as qualifying for the enhancement mandated by § 841(b)(1)(A). Those drugs, according to Mr. Sorensen, are propylhexedrine and scopolamine. Therefore, Mr. Sorensen says, the Arizona law is broader than § 802(44) and a conviction under that statute cannot serve as a predicate offense. This is true if the various schedules of drugs listed by Arizona are only alternative "means" of committing the crime of possession of a "dangerous drug." The government argues that each separate drug listed in Arizona's statute constitutes a separate element, thus allowing this court to apply the modified categorical approach to determine what the specific facts of Mr. Sorenson's conviction were.

No one disputes Mr. Sorenson was actually convicted of possession of methamphetamine in Arizona. No one disputes that the federal drug laws make it a felony to possess methamphetamine. Thus, whether the separate drugs criminalized under Arizona law are elements or means is determinative in this case because the answer to that question determines whether the sentencing court can only compare elements of the state crime and the federal crime, or whether the court can "look behind" the conviction to examine facts.

The <u>Mathis</u> Court again provides guidance.  In determining whether the various drugs listed in Arizona's statute are elements or means, courts should first look to Arizona state law to see if state law definitively answers the question.  <u>Mathis</u>, 136 S. Ct. at 2256.

In <u>Arizona v. Castorina</u>, No. 1 CA-CR 08-0816, 2010 WL 2450117, at *3-4 (Ariz. Ct. App. June 17, 2010), an intermediate appellate court in Arizona was presented with an argument by a defendant that the state was required to prove at his trial, and did not do so, which of several bottles of pills he was found in possession of was a "dangerous drug" under Arizona's drug laws.  The court affirmed the defendant's conviction, stating the state was required to prove defendant possessed a dangerous drug and that he knew the drug he possessed was a dangerous drug, but the state did not have to prove *which* of the many drugs on Arizona's drug schedule the defendant knew he possessed.  <u>Id.</u> at *4.

Mr. Sorenson argues this opinion shows that the various drugs on Arizona's drug schedule are merely alternative *means* of committing the singular crime of possession of a "dangerous drug."  The seemingly broad holding of <u>Castorina</u> is undercut by the factual record in the case, which revealed the jury actually found the defendant to have possessed several discrete, named drugs.  <u>Id.</u> at *6-7.

Mr. Sorenson also cites <u>Arizona v. Cheramie</u>, 189 P.3d 374, 376 (Ariz. 2008), which held that the elements of proof for possession of a

dangerous drug under ARS § 13-3407(A)(1) are (1) possession (2) of a
"dangerous drug."  The statute involved in <u>Cheramie</u> is the same statute
and subdivision under which Mr. Sorenson was convicted.  However, the
<u>Cheramie</u> court did not address whether individual drugs in its drug
schedules are elements or means.

Mr. Sorensen also argues that because there is a separate portion
of the Arizona code altogether (ARS § 13-3401) that enumerates the
possible substances that fit the definition of "dangerous drug" within
ARS § 13-3407, then those "dangerous drugs" are "means" not
"elements."  <u>See</u> Docket No. 35, p. 7 (citing ARS § 13-3401(6) and <u>United
States v. Headbird</u>, 832 F.3d 844, 849 (8th Cir. 2016) (fact that definition
of a statutory phrase is contained in a separate section of the code
provides textual support for the conclusion that the phrase is intended
as an element of the crime, and the list in the definition section contains
means by which that element may be committed)).  <u>See also</u> <u>United
States v. McFee</u>, 842 F.3d 572, 575 (8th Cir. 2016) (holding that a
statute which defined various ways of committing a crime in a separate
statute contained alternative means, not elements, therefore requiring
application of the categorical approach).

The government, for its part, points out that under Arizona's drug
laws, ARS § 13-3407(B)(1), the crime of possession of methamphetamine
is excluded from those "dangerous drug" crimes which are eligible for a
misdemeanor conviction.  Since different penalties apply, the government

38

argues that this shows the Arizona statute lists alternative *elements*, not

*means*, and thus allows the court to apply the modified categorical

approach.  Docket No. 41, p. 6 (citing <u>Mathis</u>, 136 S. Ct. at 2256).

The government also argues that the fact that Arizona law

criminalizes the possession of "a" dangerous drug instead of "any"

dangerous drug shows that the discrete dangerous drugs listed by

separate statute are elements, not means, and therefore allow the court

to apply the modified categorical approach.  It is true that the Eighth

Circuit relied on the distinction between a statute's use of the word "a"

instead of "any" to apply the modified categorical approach in <u>Martinez v.</u>

<u>Sessions</u>, 893 F.3d 1067, 1071 (8th Cir. 2018).  However, the reliance

was on *Missouri court opinions* that drew the "a"-vs-"any" distinction.  <u>Id.</u>

The Seventh Circuit has examined the exact Arizona statute

Mr. Sorenson was convicted of as listed in his § 851 information, albeit a

different subdivision of that statute (ARS § 13-3407(A)(3)), and held that

the categorical approach must be applied and that the Arizona drug

conviction cannot be considered a felony drug conviction for purposes of

§ 851 because its elements are broader than the elements under federal

drug laws.  <u>See</u> <u>United States v. Elder</u>, 900 F.3d 491, 497-502 (7th Cir.

2018).  Moreover, the Seventh Circuit rejected the government's

argument in that case that the modified categorical approach could be

applied because each individual drug under Arizona's drug schedule was

an alternative "element" to be proved, thus justifying a sentencing court

39

in looking behind the conviction at source documents from the state court file.  Id. at 502-03.  The listing of separate drugs were merely "means" of committing the crime of possession of a "dangerous drug."  Id. Importantly, the Elder court did not find any decision from the Arizona Supreme Court addressing this issue; instead, it based its decision on the structure and form of the Arizona statutes, as well as the Supreme Court's decisions in Mathis and Taylor.  Id.

The Seventh Circuit subsequently applied the categorical approach to hold that two convictions under Indiana and Illinois law could not be predicate offenses under 21 U.S.C. §§ 841(b)(1)(A) and 802(44) because the drug schedules under each state's law was broader than the drugs criminalized under federal law.  United States v. De La Torre, 940 F.3d 938, 948-52 (7th Cir. 2019).  The format of the Illinois and Indiana laws examined in De La Torre were similar to the Arizona statute at issue here and in Elder: all had one statute which criminalized the possession of a generic term ("controlled substance" or "controlled or counterfeit substance"), while a comprehensive list of drugs covered by the generic term were listed elsewhere in a separate statute.  Id.  Importantly, both the Indiana and Illinois statutes, like the Arizona statute, criminalized possession of "a" controlled substance, not "any" controlled substance. Id. at 949, 950-51.

In an unpublished opinion, the Ninth Circuit interpreted a different, but similar, Arizona drug statute and concluded the list of

separate drugs were elements, not means, and thus a modified categorical approach could be applied.  Gonzalez-Dominguez v. Sessions, 743 F. App'x 808, 812 (9th Cir. 2018) (unpub'd).  The Ninth Circuit has now certified a question to the Arizona Supreme Court as to whether two Arizona statutes similar to the one Mr. Sorenson was convicted under are divisible as to drug type—that is, asking whether individual drug types are elements or means.  Romero-Millan v. Barr, 958 F.3d 844, 849 (9th Cir. 2020).  It is unknown as of this writing if the Arizona Supreme Court will agree to answer the question.

In United States v. Vanoy, 957 F.3d 865, 867 (8th Cir. 2020), the Eighth Circuit applied a modified categorical approach to determine if a defendant's prior Virginia drug conviction could be used to enhance his sentence for a firearms offense in federal court.  Vanoy is distinguishable from Mr. Sorenson's case on three grounds.  First, Vanoy was concerned with whether the defendant's prior conviction constituted a "serious drug offense" under 18 U.S.C. § 924(e)(2)(A)(ii) and 21 U.S.C. § 802(6), while Mr. Sorenson's case presents the question whether his Arizona conviction was a "felony drug offense" under 21 U.S.C. §§ 841(b)(1)(A) and 802(44).

Second, the state law of Virginia was clear and settled that the discrete type of drug a defendant possessed was an *element* the Commonwealth had to prove in order to secure a conviction.  Vanoy, 957 F.3d at 868.  Here, the Seventh Circuit has found Arizona law sufficiently

clear showing the different drug types are means, not elements; while the Ninth Circuit has indicated it "f[ou]nd it difficult" to determine the answer to that question under Arizona's laws.  <u>Romero-Millan</u>, 958 F.3d at 848-49.

Third, most obviously, <u>Vanoy</u> dealt with Virginia state law while Mr. Sorenson's case deals with Arizona law.  One state's statutes may set forth discrete drugs as elements, while another state's statutes may provide discrete drugs are merely means.  Thus, a federal court determining whether a prior conviction can be used to enhance a federal sentence may apply the categorical approach to Arizona's laws and the modified categorical approach to Virginia's laws.  Because, as <u>Mathis</u> teaches, whether alternatively stated items are means or elements—and therefore whether the categorical or modified categorical approach applies—should be determined first and foremost with reference to state law.

In <u>Martinez v. Sessions</u>, 893 F.3d 1067, 1069 (8th Cir. 2018), the court approved a decision of the Board of Immigration Appeals to remove an alien from the United States because he had a prior conviction for possession of a controlled substance under Missouri state law.  The Board had applied a modified categorical approach after concluding that different specific drug types were elements of the offense under Missouri law rather than mere means.  <u>Id.</u>  The Eighth Circuit affirmed, finding two decisions from Missouri's intermediate appellate courts which had

42

held that the specific type of controlled substance was an element of the crime, despite the fact those drugs were listed in a separate statute.  Id. at 1070-71 (citing Missouri v. Harris, 153 S.W.3d 4, 7-8 (Mo. Ct. App. 2005); and Salmons v. Missouri, 16 S.W.3d 635, 637-38 (Mo. Ct. App. 2000)).  One of the intermediate Missouri appeals court's decisions premised its holding on the fact that the Missouri statute criminalized possession of "a" controlled substance instead of "any."  Martinez, 893 F.3d at 1071 (quoting Harris, 153 S.W.3d at 7-8).

Again, Martinez is distinguishable in that the Missouri law available to the court, even though not from the highest state court, all pointed toward different types of drugs being elements of the crime.  Here, the two decisions from Arizona available to the court point in the opposite direction—indicating that different types of drugs are not elements, merely means.  Also, Martinez was interpreting whether the Missouri conviction was either a "controlled substance offense" or an "aggravated felony" which justified deportation.  The issue in this case is whether Mr. Sorenson's Arizona conviction was a "felony drug offense."

The same result from Martinez was reached in another immigration deportation appeal, Rendon v. Barr, 952 F.3d 963, 967-69 (8th Cir. 2020).  In Rendon, the court examined decisions of a Minnesota intermediate appellate court and concluded that, under Minnesota's drug statutes, discrete controlled substances constituted elements of the offense, not means, thus justifying the immigration board to resort to the

43

modified categorical approach in determining if the alien had committed a deportable drug crime.  Id. (discussing Minnesota v. Papadakis, 643 N.W.2d 349, 352 (Minn. Ct. App. 2002)).  The fact that Minnesota law allowed a defendant to be convicted of multiple counts of possession while possessing different drugs at the same time was strong evidence the individual substances were elements, not means.  Id.

In summary, the evidence from case law and statutory structure as to whether discrete drugs are elements or means under the Arizona statue of conviction in Mr. Sorenson's case is mixed.  On the one hand, the fact that individual substances are listed in a separate schedule weighs in favor of finding that proof of possession of a discrete substance is a means, not an element.  Headbird, 832 F.3d at 849; McFee, 842 F.3d at 575.  Also, an intermediate state appellate court in Arizona as well as the Seventh Circuit have found the listing of various controlled substances in the Arizona law to be means, not elements.  Elder, 900 F.3d at 497-502; Castorina, 2010 WL 2450117, at *3-4.  In Martinez and Rendon, where the Missouri and Minnesota Supreme Courts had not yet spoken, the Eighth Circuit found persuasive decisions of Missouri and Minnesota intermediate appellate courts addressing the means vs. elements issue.  Rendon, 952 F.3d at 968-69; Martinez, 893 F.3d at 1069-70.  Finally, the Arizona Supreme Court appears to have spoken en banc, although the statement is devoid of any analysis, when it held that the elements of an offense under ARS § 13-3407(A)(1) require only

44

proof of (1) possession (2) of a dangerous drug, not a specified and identified particular drug. <u>Cheramie</u>, 189 P.3d at 376.

On the other hand, the fact that Arizona law provides a different penalty for methamphetamine as well as a handful of other discrete substances weighs in favor of finding that discrete substances are elements, not means. <u>Mathis</u>, 136 S. Ct. at 2256. The government's argument that the Arizona statute uses the article "a" as opposed to "any" to describe "dangerous drug" is not entitled to great weight. The Eighth Circuit's reliance on the distinction between a statute's use of the word "a" as opposed to "any" was drawn by state court decisions of the Missouri law the court was interpreting. <u>Martinez</u>, 893 F.3d at 1071 (citing <u>Harris</u>). Here, the government has not pointed to any decision of any Arizona court drawing a similar distinction between "a" and "any" with regard to the Arizona statute. Mr. Sorenson has, by contrast, supported his argument with citation to arguably supportive state case law. In addition, the <u>Elder</u> court reached the opposite conclusion involving this very Arizona law that uses the word "a" dangerous drug, not "any." The court concludes that this is just one factor of many that must be considered.

The government's Rule 12(b)(6) motion raises the question at a very preliminary stage of the litigation whether Mr. Sorenson can show any set of plausible facts that would enable him to prevail. There is, as of yet, no definitive opinion from the highest state court in Arizona on the

45

issue of whether separate drugs in the Arizona drug statutes are elements or means. However, the Arizona Supreme Court has been asked to answer a certified question on this subject by the Ninth Circuit. This court cannot conclude at this procedural posture of Mr. Sorenson's case that he will not be able to prove any set of facts that would enable him to prevail. For that reason, the court recommends denying the government's motion to dismiss as to the issue of whether Mr. Sorenson's Arizona conviction is an appropriate predicate offense for purposes of an § 851 information.

It is worth pointing out that, if Mr. Sorenson had been sentenced after passage of the First Step Act just a short time after he actually was sentenced, he would not have received a life sentence because two-time recidivists under the Act are subject to a 25-year mandatory minimum.[5] The First Step Act clearly does not apply to Mr. Sorenson—its very terms explicitly provide they are not retroactive. However, the court should not doubly disenfranchise Mr. Sorenson by denying relief now—with prejudice—at this procedural posture of the case, when the Arizona Supreme Court may issue a decision weeks or months in the future that, had it been issued earlier, would have afforded Mr. Sorenson relief. The court recommends allowing Mr. Sorenson's claim that his Arizona

---

[5] The First Step Act is discussed in greater detail at subsection E(1) of the DISCUSSION section of this opinion, *infra*.

conviction does not constitute a "felony drug offense" under 21 U.S.C. §§ 841(b)(1)(A) and 802(44) to go forward.

One final note on the Arizona conviction.  The government cites United States v. Boleyn, 929 F.3d 932, 938 (8th Cir. 2019), for the proposition that this court need only determine if Mr. Sorenson's underlying conviction was related to controlled substances and whether it was punishable by more than a year in prison.  According to the government, if the answer to both those questions is "yes," Mr. Sorenson's conviction is a proper predicate offense under §§ 841(b)(1)(A) and 802(44).  See Docket No. 41, pp. 3-4.  The court does not read Boleyn to reach that far.

Boleyn was a consolidated appeal of five different defendants whose penalties for federal crimes were enhanced under both the ACCA and § 841(b)(1)(A) of the Controlled Substances Act because they had prior convictions under the same Iowa drug statute.  Id. at 934-36.  All argued that Iowa's law swept more broadly than federal statutes because Iowa law included aiding and abetting, and Iowa law required a lesser *mens rea* for aiding and abetting than did federal law.  Id.  The court rejected that argument because a decision of the Iowa Supreme Court had held the *mens rea* required for aiding and abetting under Iowa law was the same as that required by federal law.  Id. at 940 (citing Iowa v. Lott, 255 N.W.2d 105, 108 (Iowa 1977)).  Thus, the bedrock of the Boleyn decision was that there *was* no difference in the scope of federal law and

47

Iowa law with regard to aiding and abetting—the Iowa law was not overbroad.  Id.  The court finds the Boleyn opinion inapposite to the issue addressed herein regarding Mr. Sorenson's Arizona conviction, where both parties agree state law sweeps more broadly than federal law.

### 2.    South Dakota Conviction

On direct appeal, Mr. Sorensen challenged the validity of the South Dakota conviction as a predicate offense.  Sorensen, 893 F.3d at 1065.  On direct appeal, the basis of Mr. Sorensen's challenge as to the South Dakota conviction was that it did not qualify as a predicate offense under § 841(b)(1)(A) because there was no record of drug quantity to review.  Id.  Mr. Sorensen cited Carachuri-Rosendo v. Holder, 560 U.S. 563 (2010), in support of his argument.  Because this claim was made for the first time on appeal, the Eighth Circuit reviewed it for "plain error."  Id.  The court rejected Mr. Sorensen's claim.  Sorensen, 893 F.3d at 1066.

The court explained that Carachuri-Rosendo was unhelpful to Mr. Sorensen because it considered the definition of an aggravated felony and the use of a predicate conviction for immigration purposes.  Id.  The court explained that the relevance of Carachuri-Rosendo's holding as it pertained to Mr. Sorensen's case, stating that, where a maximum term of imprisonment of more than one year is directly tied to recidivism, an actual recidivist finding—rather than the mere possibility of a recidivist finding for a hypothetical defendant—must be a part of a particular defendant's record of conviction in order for that conviction to qualify as

48

a felony under § 841(b)(1)(A).  Id.  So, the court explained, while

Carachuri-Rosendo was applicable generally, it was not applicable in

Mr. Sorensen's case.  Id.  This was because, the court explained, "[t]here

was no issue as to whether Sorensen's South Dakota record of conviction

contained a finding of recidivism sufficient to support an enhancement

under § 841(b)[(1)(A)].  The focus here is whether the South Dakota

conviction satisfied the definition of 'felony drug offense' under

§ 802(44)."  Id.

The court found that Mr. Sorensen's South Dakota conviction was

one "punishable by more than one year in prison."  Id.  The court

concluded that "the state conviction meets the statutory requirements as

a prior felony drug offense under 21 U.S.C. § 841(b)."  Id.

In this § 2255 proceeding, Mr. Sorensen again claims his South

Dakota conviction was improperly used to enhance his sentence, but he

raises a different argument.  Here, Mr. Sorensen asserts that, like the

Arizona conviction,  the South Dakota conviction does not constitute a

"felony drug offense" under 21 U.S.C. §§ 841(b)(1)(A) and 802(44).  See

Docket No. 2, p. 5.  Because this new argument was not made on direct

appeal, it is procedurally defaulted unless Mr. Sorensen shows the

requisite cause and prejudice or by demonstrating a fundamental

miscarriage of justice.  Bousley, 523 U.S. at 622.  For the same reasons

discussed above in connection with this court's discussion of the Arizona

conviction, the court finds Mr. Sorenson has adequately demonstrated

cause and prejudice for purposes of the government's Rule 12(b)(6)
motion. The court, therefore, addresses the merits of Mr. Sorenson's
claim to determine if his argument is viable as a matter of law.

The South Dakota statute under which Mr. Sorensen was
convicted (SDCL § 22-42-5) (see Docket No. 2-2) stated as follows on the
date of Mr. Sorensen's conviction:

**22-42-5. Unauthorized possession of controlled drug or substance as felony.**

No person may knowingly possess a controlled drug or
substance unless the substance was obtained directly or
pursuant to a valid prescription or order from a practitioner,
while acting in the course of the practitioner's professional
practice or except as otherwise authorized by chapter 34-
20B. A violation of this section is a Class 4 felony.[6]

Controlled drug or substance, in turn, was defined as "a drug or
substance, or an immediate precursor of a drug or substance, as listed in
Schedules I through IV. The term includes an altered state of a drug or
substance listed in Schedules I through IV absorbed into the human
body." SDCL § 22-42-1(1). The government does not dispute that, at the
time of Mr. Sorensen's conviction, both methamphetamine (a drug found
on the federal drug schedules) and diprenorphine (a drug not found on
the federal drug schedules) were listed on Schedule II of the South
Dakota drug schedules. See SDCL § 34-20B-16(6) & (13).

---

[6] In 2013, this statute was amended to add different provisions for
ingestion, and to add different penalties for different drugs, depending
upon which schedule the drug is categorized in. See 2013 revisions.

Mr. Sorensen asserts that, because the phrase "controlled drug or substance" is defined in a separate statute, it lists alternative means rather than elements pursuant to <u>Headbird</u>, 832 F.3d at 849.  <u>See also</u> <u>McFee</u>, 842 F.3d at 575.  He further argues that, because both methamphetamine (included on the federal schedule) and diprenorphine (not included on the federal schedule) were listed on the same South Dakota drug schedule (Schedule II), and both carried the same penalty under South Dakota law, they were "means" not "elements."  Finally, Mr. Sorenson argues that the South Dakota drug statute is broader than the federal drug statutes because it criminalizes the act of ingestion of a controlled substance and treats it as a felony—something neither the federal law nor any other state law in the nation does.

Mr. Sorensen and the government cite different decisions from the South Dakota Supreme Court in support of their arguments that different drugs are means or elements (respectively).  Mr. Sorensen cites <u>State v. Schrempp</u>, 887 N.W.2d 744, 749 (S.D. 2016), while the government cites <u>State v. Burkman</u>, 281 N.W.2d 436 (S.D. 1979); <u>State v. Busack</u>, 532 N.W.2d 413, 414, 417 (S.D. 1995); <u>State v. Kienast</u>, 553 N.W.2d 254 (S.D. 1996); and <u>State v. Dosch</u>, 747 N.W.2d 142 (2008).

Mr. Sorensen cites <u>Schrempp</u> for the proposition that, in South Dakota, the particular drug type is not an element of the crime which must be agreed upon by the jury.  <u>See</u> Docket No. 35, p. 12.  The facts of the <u>Schrempp</u> decision are that Ms. Schrempp and her boyfriend were

51

jointly charged in an eight-count indictment that included a charge of possession of hashish[7] in violation of SDCL § 22-42-5, possession of marijuana in violation of SDCL § 22-42-6, and possession with intent to manufacture hashish in violation of SDCL § 22-42-2. Schrempp, 887 N.W.2d at 746.

At the pretrial conference the day before trial, the state moved to amend the indictment to reference "Delta-9-Tetrahydrocannabinol" instead of "hashish" in counts 3 and 7 of the indictment. Id. The need for this amendment came after the state received the chemist's test results. Id. With both parties' consent, the trial court amended the indictment by crossing out the word "hashish" and adding "Delta-9-Tetrahydrocannabinol AKA Hashish" in the margins along with the court's initials and date. Id.

At Ms. Schrempp's trial, a police detective testified that the active ingredient in marijuana is Tetrahydrocannabinol (THC). Id. The detective explained one method of making hashish to the jury, which was packing the marijuana into tubes, and flushing butane through the leaves, which caused a resin or wax-like substance to come out the bottom of the tube. Id. The resin is known as hashish, also sometimes known as "concentrate." Id.

---

[7] Greatly simplified, hashish is a concentrated form of marijuana. See https://www.drugs.com/illicit/hashish.html. (All internet citations in this opinion last checked on September 21, 2020).

The jury convicted Ms. Schrempp on all counts in the indictment except a possession of cocaine count. Id. at 747. Ms. Schrempp appealed, arguing the trial court was without jurisdiction to amend the indictment, even with the parties' consent or, alternatively, that it was plain error for the court to so amend the indictment. Id. She asserted there was no evidence presented that Delta-9-Tetrahydrocannabinol and hashish were the same substance and thus, the amendment could have been confusing to the jury. Id. In a footnote, the court explained that though Tetrahydrocannabinol and hashish were listed in the same drug schedule (Schedule I), they were listed as *separate* drugs. Id. at 747 n.1.

The court rejected Ms. Schrempp's jurisdictional argument, but reviewed for plain error. Id. at 747-48. In other words, the error must have affected Ms. Schrempp's substantial rights. Id. at 748. The court noted that though the name of the substance in counts 3 and 7 had been changed, the charging statute referenced in the indictment had remained the same, and the drugs were in the same schedule of controlled substances. Id. at 749. The jury was correctly instructed as to the elements of counts 3 and 7. Id. The court stated that "[w]hether the drug in this case is technically known as hashish or by its chemical compound Delta-9-Tetrahydrocannabinol, the name is not an essential element of the offenses as both are controlled schedule I substances." Id. Therefore, the court found the amendment before trial was simply one of form, and did not affect Ms. Schrempp's substantial rights. Id.

Although the words written by the Schrempp court are helpful to Mr. Sorenson—"the name [of a controlled substance] is not an essential element of the offenses"—read in context, the opinion does not stand for the proposition that individual substances under South Dakota drug laws are mere means.  The facts of Schrempp itself show that.  Although all eight charges in Schrempp stemmed from evidence seized during a single search of Ms. Schrempp's home, and thus were possessed at the same time by Ms. Schrempp, she was charged with separate counts of possession of hashish/Delta-9-Tetrahydrocannabinol and possession of cocaine, both in violation of SDCL § 22-42-5.  Id. at 746.  Evidence that a defendant can be charged with multiple counts of violation of the same statute for simultaneous possession of multiple illegal drugs is strong evidence that the individual drugs are elements, not means, and thus resort to the modified categorial approach is warranted.  Rendon, 952 F.3d at 969; Martinez, 893 F.3d at 1071.  The court next examines South Dakota cases cited by the government.

In Burkman, Mr. Burkman, was arrested on suspicion of breaking into two medical buildings.  Burkman, 281 N.W.2d at 438.  A search of his vehicle revealed two containers which held four drugs: (1) methamphetamine; (2) phenmetrazine; (3) cocaine; and (4) hashish. Id.  Mr. Burkman was  charged with four counts of possession of a controlled substance in violation of SDCL § 22-42-5, the same statute under which Schrempp faced multiple possession charges.  Burkman,

54

281 N.W.2d at 437.  A jury found him guilty solely of count II, possession of cocaine.  Id.

On appeal, Mr. Burkman argued the trial court erred by denying his motion to consolidate all four counts of the indictment into one count charging a single act of possession of a controlled substance.  Id. at 439. Mr. Burkman argued the substances were found in the same place and possession of the substances was prohibited by the same statute.  Id. The South Dakota Supreme Court summarily held the trial court did not err, but the court did not expand upon its holding because Mr. Burkman did not pursue the claim in oral arguments before the court.  Id.

Mr. Burkman also argued on appeal that his motion for acquittal as to count II (possession of cocaine) should have been granted, because the jury returned a not guilty verdict on Counts I, III and IV.  Id. at 439, 441.  The cocaine had been found in a tin in Mr. Burkman's car.  Id. Also found in the same tin was methamphetamine, phenmetrazine, and hashish.  Id. Mr. Burkman argued it was logically impossible for the jury to find he possessed only one of the four drugs that were found in the same tin.  Id.  The court rejected this argument.  Id.  The court explained the four counts in the indictment were based on the same transaction because they occurred at the same time and place, and the evidence required to establish one offense did not differ substantially from the evidence to establish the others.  Id.  Consistency of the verdict, however, was not necessary because the four counts were not interdependent.

55

"Each count is treated as if it were separate." Id. at 441. Because the evidence was sufficient to convict Mr. Burkman of possession of cocaine, the court refused to inquire about the jury's motives to acquit him of the other charges. Id. Again, Burkman demonstrates a defendant can be charged under South Dakota's drug laws with multiple violations of SDCL § 22-42-5 based on simultaneous possession of different controlled substances. This is strong evidence that individual substances are elements, not means. Rendon, 952 F.3d at 969; Martinez, 893 F.3d at 1071.

In Kienast, the defendant, Mr. Kienast, was charged with two counts of possession of a controlled substance as a result of an undercover drug buy. When he was arrested, he was in possession of valium and methamphetamine. Kienast, 553 N.W.2d at 255. He was convicted of both these counts at trial. Id. Though not an issue on appeal, the government cites Kienast for the proposition that possession of different drugs may be charged as different counts in the same prosecution. See Docket No. 41, p. 15. See also Dosch, 747 N.W.2d at 144 (though not an issue on appeal, defendant was charged with and convicted of ten counts of possession of a controlled substance; crime charged was possession of five different drugs that had been stolen from two different drug stores on two different dates).

It is evident from all the cases cited by both parties that, under South Dakota law, a defendant can be charged with multiple violations of

the same drug statute based on simultaneous possession of different controlled substances.  As discussed above, the Eighth Circuit finds this to be strong evidence that the listing of various drugs are elements, not means, thus justifying the application of the modified categorical approach.  Both parties agree that, applying this approach, Mr. Sorenson's South Dakota conviction counts as a felony drug crime under 21 U.S.C. §§ 841(b)(1)(A) and 802(44) because possession of methamphetamine is a violation of both state and federal law.

The court finds South Dakota law establishes that discrete controlled substances are elements, not means.  Though the list of drugs is found in a different portion of the South Dakota code, this is only one factor of many to consider and it does not mandate the conclusion that the various drugs within the schedules are means rather than elements. Rendon, 952 F.3d at 968-69 (a separate listing is a factor that supports the idea that the substance is a means rather than an element, but the separate listing is not a "universal rule" which "automatically" means such a listing mandates such a result) (quoting Martinez, 893 F.3d at 1072)).  The South Dakota statute under which Mr. Sorensen was convicted (SDCL § 22-42-5), as well as case law arising under that law, treats possession of discrete substances as elements, not means, and the modified categorical approach applies.

The court is then permitted to examine a limited number of documents, including Mr. Sorenson's South Dakota indictment and

judgment of conviction (both at Docket No 2-2), to determine whether the South Dakota conviction qualifies as a predicate offense.  Mathis, 136 S. Ct. at 2248.  It does.  Specifically, the generic federal crime "felony drug offense" in § 802(44) is an offense that is: (1) punishable by one year under any law of the United States or a State or foreign country; and (2) prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances."  See 21 U.S.C. § 802(44).  The South Dakota indictment and judgment of conviction persuade the court that Mr. Sorensen's South Dakota conviction qualifies as a predicate offense under 18 U.S.C. §§ 841(b)(1)(A) and 802(44).  Count II of the indictment (Docket No. 2-2, p. 1) charged Mr. Sorensen with "possess[ion] [of] a controlled drug or substance[,] methamphetamine[,] which is listed in Schedule II, which conduct on the part of the defendant was in violation of SDCL 22-42-5."  Id.  The judgment of conviction (Docket No. 2-2, p. 3) states Mr. Sorensen was found guilty of count II of the indictment.  It further states Mr. Sorensen was sentenced to ten years' imprisonment with eight years suspended for this crime.  Therefore, Mr. Sorensen's conviction for possession of methamphetamine in violation of SDCL § 22-42-5 was a conviction "punishable by imprisonment for more than one year under any law of . . . a State" under 21 U.S.C. § 802(44).  The court recommends granting the government's motion to dismiss Mr. Sorensen's claim that his South Dakota drug conviction did not qualify as a predicate offense.

58

**D.    Ineffective Assistance of Counsel Claims**

**1.    Standard Applicable to Ineffectiveness Claims**

The standard set forth as section C(1)(b) of the DISCUSSION section of this opinion applies to Mr. Sorenson's claims of ineffective assistance of counsel.

**2.    Failing to Challenge Whether Mr. Sorensen's South Dakota and Arizona Drug Convictions Qualified as "felony drug convictions"**

Because the court has recommended dismissal of Mr. Sorensen's claim that his South Dakota conviction was not an appropriate predicate conviction, the court also recommends dismissal of his claim that trial and appellate counsel were ineffective for failing to challenge the South Dakota conviction on that ground.  Failure to raise a meritless claim does not constitute ineffective assistance of counsel.  Thomas v. United States, 951 F.2d 902, 904 (8th Cir. 1992) ("because the claim lacks merit, [the petitioner's] attorney was not ineffective for failing to raise it.").

As to failing to challenge the Arizona conviction as a predicate offense under 21 U.S.C. §§ 841(b)(1)(A) and 802(44), the court has analyzed that above, too.  Because the government's motion is a Rule 12(b)(6) motion, and because none of Mr. Sorenson's trial or appellate counsel have addressed the issue of whether they considered challenging the Arizona conviction as a predicate offense and, if so, why they chose not to raise the issue, the court finds Mr. Sorenson has raised a

59

plausible claim upon which he may be able to prevail. For that reason, the court recommends denying the government's motion to dismiss Mr. Sorenson's ineffective assistance claim relating to failure to challenge the Arizona conviction as a predicate offense.

### 3. Failing to Investigate and Present at Least Two Defense Witnesses

Mr. Sorensen asserts his trial counsel were ineffective for failing to call two witnesses at trial to testify in his defense: Larry Kuhnert and Brian Zentner. Mr. Sorensen submitted a declaration (attached to his response in opposition to the government's motion to dismiss) explaining that he told his lawyers before trial that he wanted these two witnesses to testify, and what he thought they would say. See Docket No. 35-3.

Mr. Sorensen avers he told his trial attorneys that Larry Kuhnert had recently loaned "money" (without specifying an amount) to get Mr. Sorensen's 1971 Bronco out of Mr. Kuhnert's brother's body shop. Docket No. 35-3, ¶ 1. Mr. Sorensen mentioned this at his sentencing hearing. See ST (CR Docket No. 157), pp. 27-28 ("I borrowed that $15,000 from Larry Kuhnert. Because I had 30-some—or I had $40,000 in backpay coming."). At trial, however, the government presented expert testimony to the effect that large amounts of cash are linked to drug trafficking. TT (CR Docket No. 137), p. 406.

In his declaration, Mr. Sorensen states the body shop in Valley Springs is "on the way back from Luverne" and that is why he had so much cash on him when he was arrested. Docket No. 35-3, ¶¶ 1-2. He

wanted his attorneys to speak to Mr. Kuhnert to verify this to explain why he had so much money on his person, and to attempt to get the money back from law enforcement.  Id. at ¶ 4.  Mr. Sorensen avers that Mr. Kuhnert attended each day of his trial.  Id. at ¶ 6.  Mr. Sorensen avers he attended a "4-20" festival and concert with Mr. Zentner.  Id. at ¶ 7.  He avers Mr. Zentner took him shopping at an outlet mall, where Mr. Sorensen bought Lucky® brand jeans for a discounted price, thereafter selling them in Sioux Falls for $100 a pair to help pay for the cost of his trips to Arizona.  Id. at ¶ 8.

Mr. Sorensen's trial counsel (Mr. Rivers and Mr. Grostyan) submitted affidavits addressing Mr. Sorensen's assertions regarding these two witnesses' potential testimony.  Attorney Rivers does not recall discussing Mr. Zentner, and does not mention Mr. Kuhnert in his affidavit.  See Docket No. 23.

Attorney Grostyan, however, recalls discussing Mr. Zentner with Mr. Sorensen.  Docket No. 24, ¶ 7.  Attorney Grostyan remembers that Mr. Sorensen did not want Mr. Zentner to testify at trial.  Attorney Grostyan nevertheless researched the music festival event in Arizona that Mr. Sorensen indicated he attended with Mr. Zentner.  Attorney Grostyan found many events associated with "420" which took place on or around April 20, 2016, but found nothing that matched the specific event description provided by Mr. Sorensen.  Id.  Further, Attorney Grostyan explained that these "420" events in general are associated with

61

marijuana.[8]  Given the fact that Mr. Sorensen was being prosecuted for a drug crime, and that Attorney Grostyan could not find the specific event Mr. Sorensen claimed to have attended, Attorney Grostyan chose to abandon his efforts regarding potential witness Mr. Zentner.  Id. Further, it was Attorney Grostyan's belief that, given the government's evidence about multiple shipments from Arizona, proving up non-nefarious activities while Mr. Sorensen was in Arizona for each of these trips was unnecessary and potentially harmful to Mr. Sorensen's defense. Id.

Attorney Grostyan avers he was unable to contact Mr. Kuhnert prior to trial, and he believed that, given his assessment of the government's evidence against Mr. Sorensen, Mr. Kuhnert's purported testimony was not necessary and may have been risky to the defense in any event.  Id.

"[A] 'meaningful opportunity to present a complete defense' does not translate into the right of a defendant to present any evidence he may deem important to his defense."  Strickland v. Lee, 471 F. Supp. 2d 557, 617 (W.D.N.C. 2007) (quoting Taylor v. Illinois, 484 U.S. 400, 410 (1988)).  Instead, to prove prejudice, Mr. Sorensen must show the proposed uncalled witness would have testified in his defense, that his testimony would have been favorable, and that his testimony had the

---

[8] See https://time.com/4292844/420-april-20-marijuana-pot-holiday-history/.

potential to have "changed the outcome of the trial."  See Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990); Stewart v. Nix, 31 F.3d 741, 744 (8th Cir. 1994).  In assessing ineffective assistance claims under the Strickland standard, "[t]he decision not to call a witness is a virtually unchallengeable decision of trial strategy."  United States v. Staples, 410 F.3d 484, 488 (8th Cir. 2005) (citations omitted, punctuation altered).  The habeas court must avoid "the distorting effects of hindsight and try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time."  Id. (citations omitted, punctuation altered).

"[C]omplaints of uncalled witnesses are not favored . . . because allegations of what the witness would have testified [to] are largely speculative."  Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002). "[T]he petitioner ordinarily should explain . . . with some precision, the content of the testimony [the witness] would have given at trial." Lawrence, 900 F.2d at 130.

Here, counsel has explained why the two witnesses Mr. Sorensen now claims should have been called to testify at his trial were not called to testify.  The decision to call these witnesses is a decision of trial strategy that is "virtually unchallengeable" under the Strickland standard.  Staples, 410 F.3d at 488.  Mr. Sorensen has not met his burden to show that calling now-proposed witnesses at trial would have

favorably influenced and/or changed the outcome of his trial. <u>Lawrence</u>, 900 F.2d at 130.

Mr. Sorensen has submitted a declaration. Mr. Sorensen's declaration outlines what he told his lawyers his now-proposed witnesses would have said. Neither of the *proposed witnesses*, however, has submitted an affidavit indicating a willingness to testify to the substance of the testimony that Mr. Sorensen indicates in his own declaration. Additionally, as explained by the Eighth Circuit in its opinion on direct appeal, the evidence in Mr. Sorensen's case was overwhelming.

On direct appeal Mr. Sorensen argued the trial court erred by failing to *sua sponte* exclude the testimony of the fingerprint expert. <u>Sorensen</u>, 893 F.3d at 1064-65. The court rejected that claim, explaining Mr. Sorensen's substantial rights were not affected even if the court erred by admitting the testimony because of the additional evidence that supported his conviction. <u>Id.</u> at 1065. That evidence, according to the court, included "[t]he testimony of [Ms.] Hartz (whose credibility the jury discerned), the investigative evidence of the shipments from Arizona that corresponded with Sorensen's trips to Arizona, and the extracted data from Sorensen's phones including the identical misspelling of cities in Sorensen's contact list and the shipment labels, as well as *myriad* other evidence." <u>Id.</u> (emphasis added).

Mr. Sorensen has therefore failed to carry his burden to show either of his proposed witnesses (1) would have been willing to testify on

his behalf; (2) what their testimony would have been or, most importantly; (3) that such testimony would have had the potential to change the outcome of his jury trial. As such, this court respectfully recommends that the government's motion to dismiss Mr. Sorensen's claim that trial counsel was ineffective for failing to investigate and present at least two defense witnesses at trial be granted.

### 4. Ineffective Assistance for Advising Mr. Sorensen to Give Up His Right to Testify on His Own Behalf at Trial

In his § 2255 motion, Mr. Sorensen acknowledges he, on the record, waived his right to testify during his jury trial. See Docket No. 2, p. 10. He asserts, however, that he "wanted to testify, but was talked out of doing so by his trial attorneys." Id. He further asserts that, had he testified at trial, he "could have" rebutted the testimony of his co-conspirator, Gayle Hartz, and "could have" explained: why he traveled to Arizona, why he had so much cash on his person when he was arrested, and "other matters." He asserts his counsel's advice not to testify rose to the level of ineffective assistance because his testimony, especially in combination with that of the two witnesses his lawyers should have called to testify but did not, "would have resulted in a different outcome at trial." Id.

Mr. Sorensen's declaration also addresses this issue. See Docket No. 35-3, ¶¶ 12-19. Mr. Sorensen states in his declaration that his trial attorneys informed him that if he testified, the prosecutor would "eat

[him] up" and bring up his past drug charges.  Id. at ¶ 12.[9]  He also states his attorneys did not prepare him to testify by practicing direct or cross-examination with him.  Id. at ¶ 13.  Had he been allowed to testify, he would have explained that he went to Arizona to visit his friend Brian Zentner, and when he did, he mailed jeans back.  Id. at ¶ 14.  He would have further testified that Gayle sent a sealed envelope along with him to Arizona, that Gayle's friends came over to Brian's to pick up and send crafts back.  Id.  Mr. Sorensen gave Gayle's friends his jeans to send back, and they would bring back the receipt and tracking information to prove they mailed the jeans with her crafts.  Id.

Mr. Sorensen also explains in his declaration that he disagrees with the statements made by his trial attorneys that they discussed the pros and cons of Mr. Sorensen testifying in his own defense.  Docket No. 35-3, ¶ 15.  Instead, Mr. Sorensen asserts his attorneys pressured him to plead guilty from the beginning because "they wanted a slam dunk $25,000."  Id.  Mr. Sorensen also disagreed with his attorneys' statements that they never pressured him about whether or not to testify.  Id. at ¶ 16.

Instead, Mr. Sorensen insists that, especially after his wife testified for the government, he wanted to testify to assure the jury that he was

---

[9] Assuming this assertion is true, the district court disabused Mr. Sorensen of this notion during its colloquy with him.  The court advised Mr. Sorensen if he chose to testify the jury would be informed of the existence of his previous felony, but not the nature of the conviction. TT, pp. 424-26.

not a "skirt chaser" because he believed she had falsely testified he had cheated on her and that such testimony was damaging to him.  Id. Mr. Sorensen states his wife testified on Wednesday, but when he told his lawyers he may need to take the stand, his lawyers told him they needed to wrap the trial up the next day because they needed to be in court in Minneapolis on Friday.  Id.  Furthermore, Mr. Sorensen explains, his lawyers did not tell him about any benefits of testifying on his own behalf, only about the risks of doing so.  Id. at ¶ 17. Mr. Sorensen disagrees that no pressure was put on him not to testify. Id. at ¶ 18.  He explains he told the court he was giving up his right to testify because his lawyers "scared" him, because it was toward the end of trial, and because his lawyers had advised him on Wednesday that they needed to wrap things up the next day because they had other things to do.  Id. at ¶ 19.

A review of the trial transcript (CR Docket No. 137), pp. 424-26 reveals the following discussion which occurred outside the presence of the jury:

> MR. GROSTYAN: Yes. I don't know if you want to do any waiver of Defendant's right to testify?
>
> THE COURT: Yes. Let's do that now. I was advised last night by Defense counsel, Mr. Sorensen, that you were not going to testify. Is that correct?
>
> THE DEFENDANT: That's correct.
>
> THE COURT: And you talked all of this over with your lawyers?

THE DEFENDANT: Yes, sir, I did.

THE COURT: Are you satisfied with the advice and representation your lawyers have given you on this point?

THE DEFENDANT: Yes.

THE COURT: Are you satisfied with the advice and representation they've given you generally throughout the course of preparation as well as this trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You understand that you have a right to take the stand and to testify and tell your story, including proclaiming your innocence. You understand that?

THE DEFENDANT: I understand that.

THE COURT: As I'm talking to you here today, are you under the influence of any drugs or alcohol that would affect your ability to think in any way?

THE DEFENDANT: No, sir.

THE COURT: How old a man are you?

THE DEFENDANT: Fifty-four.  I'll be 55 this month.

THE COURT: Which day?

THE DEFENDANT: The 28th.

THE COURT: Mine is the 21st, so that's why I was curious. How much education have you had?

THE DEFENDANT: I got a GED.

THE COURT: How long ago?

THE DEFENDANT: I got it when I was 30-something.

THE COURT: Where did you get it?

THE DEFENDANT: Kilian College in Sioux Falls.

THE COURT: Do you have any questions about the right that
you have to testify?

THE DEFENDANT: No, Your Honor.

THE COURT: You realize, and also I ruled last night that if
you did testify, the jury would become aware that you had
another conviction, but the fact that that other conviction
was for drug distribution, they would not be apprised of. You
understand that?

THE DEFENDANT: I understand.

THE COURT: Considering all of that, is it still your decision
not to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Very well. Bring in the jury.

See TT (CR Docket No. 137), pp. 424-26.

The United States Supreme Court has explicitly stated that, under
the Fourteenth Amendment due process clause, the Sixth Amendment
compulsory process clause, and the Fifth Amendment prohibition against
compelled testimony, criminal defendants have a constitutional right to
choose whether to testify on their own behalf. Rock v. Arkansas, 483
U.S. 44, 51-53 (1987). Because the right to testify is a fundamental
constitutional right, only the defendant is empowered to waive it. United
States v. Bernloehr, 833 F.2d 749, 751 (8th Cir. 1987) (citing Jones v.
Barnes, 463 U.S. 745, 751 (1983)) (other citations omitted). The
defendant's waiver of this right must be made voluntarily and knowingly.
Bernloehr, 833 F.2d at 751.

69

In Bernloehr, the court rejected the habeas petitioner's claims that his desire to testify at his own criminal trial was "overcome" by his attorney, and that the trial court had an affirmative duty to inquire of him whether he wished to testify.  Id.  The court found that Mr. Bernloehr was a "mature and sophisticated businessman" who was represented by able counsel.  Id.  Further, Mr. Bernloehr made no objection when his counsel rested the defense case without calling Mr. Bernloehr to the stand.  Id. at 752.  In such circumstances, the court found, the defendant must act affirmatively to assert his right rather than sit idly by and indicate his apparent acquiescence with his attorney's advice.  Id.  "The defendant may not, as Bernloehr did, indicate his apparent acquiescence in his counsel's advice that he not testify, and then later claim that his will to testify was 'overcome.'"  Id. (citing Hollenbeck v. Estelle, 672 F.2d 451, 453 (5th Cir. 1982)).

The Eighth Circuit has repeatedly held that a post-conviction petitioner may not prevail under such circumstances, whether in the context of an ineffective assistance claim, or whether the claim is grounded solely in the petitioner's constitutional right to testify. See e.g. Frey v. Schuetzle, 151 F.3d 893, 897-98 (8th Cir. 1998) (petitioner's claim he did not knowingly and voluntarily waive his right to testify at trial rejected where petitioner claimed he told his attorney he wanted to testify, the attorney advised against it, and petitioner voiced no objection when the attorney rested the defense without calling petitioner to testify);

70

<u>Possick v. United States</u>, No. 86-2356, 1992 WL 205725, at *1 (8th Cir. 1992) (per curiam) (ineffective assistance claim rejected where petitioner argued counsel denied him his right to testify, but petitioner admitted he was aware of his right at trial but did nothing to assert it).

Here, Mr. Sorensen asserts he wanted to testify but was "talked out of doing so" by his attorneys.  Docket No. 2, p. 10.  He also claims his attorneys "scared" him into not testifying.  Docket No. 35-3, ¶ 19.  Attorney Rivers' affidavit (Docket No. 23, ¶ 7) explains that he and attorney Grostyan discussed the possibility of Mr. Sorensen testifying on his own behalf with Mr. Sorensen, and how Mr. Sorensen's testimony might weigh "for or against him" at trial.  Ultimately, however, attorney Rivers averred the decision whether to testify on his own behalf was left solely to Mr. Sorensen.  <u>Id.</u>  Attorney Grostyan's affidavit indicates that attorney Grostyan likewise recalls talking to Mr. Sorensen about the potential benefits and risks of Mr. Sorensen testifying on his own behalf.  Docket No. 24, ¶ 8.  Attorney Grostyan averred that the decision whether to testify was made by Mr. Sorensen, without having been put under pressure or having been convinced by attorney Grostyan or attorney Rivers.  <u>Id.</u>   These attorneys' statements are supported by Mr. Sorensen's above-cited on-the-record (out of the presence of the jury) statement to the court that Mr. Sorensen was fully aware of his right to testify, that he was satisfied with his lawyer's advice about this issue, and that he decided not to testify.  <u>See</u> TT (CR Docket No. 137), pp. 424-

71

26.  Under these circumstances, Mr. Sorensen cannot be heard to now complain that his attorneys' ineffectiveness prevented him from testifying or that he was deprived of his constitutional right to testify.  Frey, 151 F.3d at 897-98; Possick, 1992 WL 205725, at *1; Bernloehr, 833 F.2d at 752.  As such, this court recommends that the government's motion to dismiss Mr. Sorensen's claim that trial counsel was ineffective for advising Mr. Sorensen to give up his right to testify be granted and the claim dismissed.

### E.    Mr. Sorensen's Life Sentence for a Drug Offense Violates His Rights Under the Equal Protection Clause and the Eighth Amendment

Mr. Sorensen raises two challenges to the imposition of a life sentence for his nonviolent drug crime.  The court addresses these challenges in turn below.

#### 1.    Equal Protection

In this, his § 2255 motion, Mr. Sorensen asserts the imposition of a life sentence for a nonviolent drug offense violates the Equal Protection Clause of the Fourteenth Amendment.  This argument is based upon the application of the First Step Act[10] to persons who were sentenced *after* December 21, 2018, (the date the First Step Act was enacted), but not to persons who were sentenced *before* December 21, 2018.

---

[10] The First Step Act of 2018.  Pub. L. No. 115-391, § 401(a)(2), 132 Stat. 5194, 5220-21 (enacted Dec. 21, 2018).

Less than two years after Mr. Sorensen was sentenced, Congress eliminated mandatory life sentences for most drug offenders in the First Step Act.  The mandatory sentence under 21 U.S.C. § 841(b)(1)(A) for a person with two qualifying prior convictions is now 25 years to life.[11]  Id. at § 401(a).  Under the First Step Act, simple possession convictions no longer qualify to enhance the sentencing range under 21 U.S.C. § 841(b)(1)(A).  Instead, under the First Step Act, a prior conviction for a "serious drug felony" or a "serious violent felony" can qualify as a sentence enhancement under 21 U.S.C. § 851.

The term "serious drug felony" does not include simple possession offenses.  "Serious drug felony" means an offense "involving manufacturing, distributing, or possessing with intent to manufacture or distribute a controlled substance" for which the maximum penalty is 10 years or more, the offender served more than 12 months in prison, and the offender was released within 15 years of the instant offense. 21 U.S.C. § 802(57); 18 U.S.C. § 924(e)(2)(A)(ii).  Thus, if Mr. Sorensen had been sentenced after the enactment of the First Step Act, neither of his prior convictions (both of which were simple possession convictions) would have qualified to enhance his sentence.  The First Step Act by its own terms, however, does not apply retroactively to those persons who were sentenced before the date of its enactment.  First Step Act, Pub. L.

---

[11] The mandatory minimum sentence for a defendant with one prior conviction for a "serious drug felony" is now 15 years.  First Step Act at § 401(b).

73

No. 115-391, § 401(c) (explaining that applicability of the Act is confined to those who have yet to be sentenced as of such date of enactment).

Mr. Sorensen challenged his life sentence on direct appeal, but he did not raise an Equal Protection claim. During the pendency of his appeal, however, the First Step Act had not yet been enacted. Mr. Sorensen filed his notice of appeal on May 3, 2017 (see CR Docket No. 150) and the Eighth Circuit issued its decision on June 26, 2018 (Sorensen, 893 F.3d at 1060)—some six months before the First Step Act was enacted. As such, the government does not raise procedural default as a defense to this claim, and the court likewise does not discuss procedural default.

However, Mr. Sorensen's Equal Protection claim fails on the merits. The equal protection clause requires the government to "treat similarly situated people alike," a protection that applies to prisoners. Murphy, 372 F.3d at 984. To show an equal protection violation, Mr. Sorensen must show: (1) he is treated differently than a similarly situated class of inmates, (2) the different treatment burdens a fundamental right, and (3) there is no rational relation to any legitimate penal interest. Id. (citing Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999) (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985))).

In Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 815-16 (8th Cir. 2008), the Eighth Circuit explained that, for a prisoner to prevail on an equal protection claim, he "must show that he is treated differently from

74

similarly-situated inmates and that the different treatment is based upon either a suspect classification or a fundamental right." Id.  If an equal protection claim is not based on a "suspect class" or a fundamental right, it is subject to a rational basis review.  Gilmore v. County of Douglas, State of Nebraska, 406 F.3d 935, 937 (8th Cir. 2005) (citations omitted). This protection applies to the federal government through the Fifth Amendment.  Schweiker v. Wilson, 450 U.S. 221, 226 n.6 (1981).  A legislative classification among non-suspect class groups violates the Equal Protection clause if it bears no "rational relation to some legitimate end."  Romer v. Evans, 517 U.S. 620, 631 (1996).  "Neither prisoners nor indigents constitute a suspect class . . . ."  Murray v. Dosal, 150 F.3d 814, 818 (8th Cir. 1998).

The rational basis review is "the paradigm of judicial restraint. Congress does not violate the right to equal protection merely because the classifications made by its laws are imperfect, or because in practice a classification results in some inequality."  Minn. Senior Fed'n, Metro. Region v. United States, 273 F.3d 805, 808 (8th Cir. 2001) (citations omitted, punctuation altered).

The United States Supreme Court has explained the rational basis review in an equal protection analysis as follows:

> [It] is not a license for courts to judge the wisdom, fairness or logic of legislative choices.  Nor does it authorize the judiciary to sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.  For these reasons, a classification neither

> involving fundamental rights nor proceeding along suspect
> lines is accorded a strong presumption of validity.  Such a
> classification cannot run afoul of the Equal Protection
> Clause if there is a rational relationship between the
> disparity of treatment and some legitimate governmental
> purpose.  Further, a legislature that creates these categories
> need not actually articulate at any time the purpose or
> rationale supporting its classification.  Instead, a
> classification must be upheld against an equal protection
> challenge if there is any reasonably conceivable state of facts
> that could provide a rational basis for the classification.
>
> A [s]tate, moreover, has no obligation to produce evidence to
> sustain the rationality of a statutory classification.  A
> legislative choice is not subject to courtroom factfinding and
> may be based on rational speculation unsupported by
> evidence or empirical data.  A statute is presumed
> constitutional, . . ., and the burden is on the one attacking
> the legislative arrangement to negative every conceivable
> basis which might support it, whether or not the basis has a
> foundation in the record.  Finally, courts are compelled
> under rational-basis review to accept a legislature's
> generalizations even when there is an imperfect fit between
> means and ends.  A classification does not fail rational-basis
> review because it is not made with mathematical nicety or
> because in practice it results in some inequality.

Heller v. Doe, 509 U.S. 312, 319-320 (1993) (citations omitted,

punctuation altered).

Mr. Sorensen concedes that a rational review is the proper

standard to apply to the congressional decision that the First Step Act

should not be retroactively applied to him.  The government notes that

many courts, including the Eighth Circuit, have rejected equal protection

challenges to sentencing reform statutes that have lowered penalties for

drug defendants prospectively but not retroactively.  See e.g. United

States v. McBride, 426 F. App'x 471, 473-74 (8th Cir. 2011); United

76

States v. Williams, 413 F. App'x 928, 930 (8th Cir. 2011) (both rejecting equal protection challenges to the Fair Sentencing Act of 2010).

In Dorsey v. United States, 567 U.S. 260 (2012), the United States Supreme Court rejected a challenge to the prospective-only application of the Fair Sentencing Act of 2010 (FSA).[12] Id. at 280. There, the Court explained that any disparity caused by the difference between the new and old sentencing statutes "reflect[s] a line-drawing effort, [and] will exist whenever Congress enacts a new law changing sentences (unless Congress intends re-opening sentencing proceedings concluded prior to a new law's effective date)." Id. The Court also explained that it was the "ordinary practice" to apply new penalties to defendants who had not yet been sentenced at the time the new law is enacted, while withholding the benefit of the change from those who had already been sentenced. Id.

Circuit courts of appeal other than the Eighth Circuit have also found that prospective-only application of the FSA does not violate the equal protection clause. See e.g. United States v. Bigesby, 685 F.3d 1060, 1066 (D.C. Cir. 2012) (rejecting equal protection challenge to FSA's lack of retroactivity; finding Congress' interest in the finality of sentences was a rational basis for limiting retroactive effect of the new statute); United States v. Keyes, 447 F. App'x 294, 296 (3d Cir. 2011) (rejecting equal protection challenge to the FSA); United States v. Speed, 656 F.3d 714, 720 (7th Cir. 2011) (disparate treatment of pre- and post-act

---

[12] The FSA reduced the penalties for convictions related to crack cocaine.

defendants is "plainly rational"); <u>United States v. Washington</u>, 449 F. App'x 624, 626 (9th Cir. 2011) (that FSA does not apply retroactively does not implicate equal protection); <u>United States v. Coleman</u>, 416 F. App'x 41, 44 (11th Cir. 2011) (rejecting equal protection challenge to FSA).

Mr. Sorensen asserts there is no rational basis to treat persons, such as himself, who were sentenced before the passage of the First Step Act (December 21, 2018), differently than persons who were sentenced after that date. But Mr. Sorensen offers no way to distinguish the failure to retroactively apply the First Step Act from the failure to retroactively apply the Fair Sentencing Act, which has been universally approved under the reasoning of the cases cited above. In the absence of some concrete identifiable difference in the analysis of the two acts, this court must agree with the government—there is none. As such, this court must abide by the express mandate of the First Step Act itself, which provides that its provisions are not retroactive. The disparities between pre-Act sentences and post-Act sentences, as explained by the Supreme Court in <u>Dorsey</u>, "reflect[ ] a line-drawing effort [and] will exist whenever Congress enacts a new law changing sentences (unless Congress intends re-opening sentencing proceedings concluded prior to a new law's effective date)." <u>Dorsey</u>, 567 U.S. at 280. Congress' decision to expressly make final any sentences imposed before the passage of the First Step Act final is a rational basis for failing to make the Act retroactive.

Bigesby, 685 F.3d at 1066.  Mr. Sorensen's equal protection challenge therefore fails on the merits.  Accordingly, this court recommends that the government's motion to dismiss Mr. Sorensen's claim that his life sentence violates the Equal Protection Clause of the Fourteenth Amendment be granted and that claim be dismissed.

### 2.    Eighth Amendment

At the sentencing hearing, the district court acknowledged it would not have imposed a life sentence if not required to do so by the enhancement statute.  See ST (CR Docket No. 157), p. 28.  But, as explained above, even without the enhancement, the very bottom of Mr. Sorensen's guideline range would have been 360 months (30 years), which the district court indicated it "probably would" have imposed.  Id. The government argues that, because Mr. Sorensen was 55 years old at the time of his sentencing, a life sentence and a 30-year term of imprisonment are virtually interchangeable.  But the fact that there may be little practical difference should not be an objection to justice being done.  Not to mention a term of years leaves intact a prisoner's hope and incentive to better himself, while a life sentence does neither.

Mr. Sorensen argued on direct appeal, as he does in this, his § 2255 motion, that the imposition of a life sentence for his non-violent drug crime violates his Eighth Amendment right against cruel and unusual punishment because he claims it is disproportionate to the offense.

The Eighth Circuit considered but rejected this claim.  Sorensen, 893 F.3d at 1067.  As such, this claim is barred because it was already made but rejected on direct appeal.  Sun Bear, 644 F.3d at 702.

Mr. Sorensen has not claimed the imposition of the life sentence constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." Davis, 417 U.S. at 346-47; Sun Bear, 644 F.3d at 704.  He has also not presented convincing new evidence of actual innocence.  United States v. Wiley, 245 F.3d 750, 752 (8th Cir. 2001).  Therefore, Mr. Sorensen should not be allowed to re-litigate whether his life sentence violates the Eighth Amendment prohibition against cruel and unusual punishment in this, his § 2255 proceeding.  Accordingly, this court recommends that the government's motion to dismiss Mr. Sorensen's claim that his life sentence violates the Eighth Amendment be granted and the claim be dismissed.

**F.    Rehaif Claim**

Mr. Sorensen was convicted in October, 2016, and sentenced in April, 2017.  In June 2019, the United States Supreme Court decided Rehaif v. United States, ___ U.S. ___, 139 S. Ct. 2191 (2019).  In Rehaif, the defendant was prosecuted under 18 U.S.C. § 922(g), which prohibits certain persons from possessing firearms, including felons and persons who are aliens or who are illegally or unlawfully in the United States.  A separate statutory provision, § 924(a)(2), adds that anyone who

knowingly violates the first provision shall be fined or imprisoned for up to 10 years.

Mr. Rehaif had entered the United States on a nonimmigrant student visa to attend university. Id. at 2194. He was dismissed from school for poor grades and the university told him his immigration status would be terminated unless he transferred to a different university or left the country. Id. He did neither, and subsequently visited a firing range, where he shot two guns. Id. The government prosecuted him for possessing firearms as an alien unlawfully in the United States in violation of 18 U.S.C. § 922(g) and 924(a)(2). Id.

The trial court instructed the jury, over Mr. Rehaif's objection, that the government was not required to prove Mr. Rehaif knew he was illegally or unlawfully in the United States. Id. The jury convicted Mr. Rehaif. Id. Mr. Rehaif appealed, arguing the district court erred by instructing the jury it did not need to find that Mr. Rehaif knew he was in the country illegally. Id. The Eleventh Circuit affirmed. Id. at 2195.

The Supreme Court undertook to decide whether the "knowingly" requirement pertained solely to the defendant's possession of the firearm, or also to the relevant status (i.e., that the defendant was an alien unlawfully in the United States.) Id. The lower courts were not in agreement on this point, with most finding that knowledge of status was not required. See e.g. United States v. Williams, 588 F.2d 92, 92 (4th Cir. 1978); United States v. Schmitt, 748 F.2d 249, 252 (5th Cir. 1984);

81

United States v. Oliver, 683 F.2d 224, 229 (7th Cir. 1982); United States

v. Montgomery, 701 F.3d 1218, 1221 (8th Cir. 2012); United States v.

Lupino, 480 F.2d 720, 723-24 (8th Cir. 1973); United States v. Pruner,

606 F.2d 871, 874 (9th Cir. 1979).  But see United States v. Renner, 496

F.2d 922, 926 (6th Cir. 1974) (contra).

The Court explained that whether a criminal statute requires the

government to prove a defendant acted knowingly is a question of

congressional intent.  Rehaif, 139 S. Ct. at 2195.  The Court started from

a "longstanding presumption" that Congress intends to require a

culpable mind regarding each of the statutory elements that criminalize

"otherwise innocent conduct."  Id.  This presumption applies with equal

force when Congress includes a scienter provision in the statute itself.

Id.  The Court explained that, when the statute prescribes the type of

culpability sufficient for the commission of the offense without

distinguishing among the material elements, such provision applies to *all*

the material elements unless a contrary purpose plainly appears.  Id. at

2195 (citing ALI, Model Penal Code, § 2.02(4), p. 22 (1985)).

The Court found the statutory text of §§ 922 and 924 supported

the presumption.  Id.  The term "knowingly" in § 924(a)(2) modifies the

verb "violates" and its direct object, which in Mr. Rehaif's case was

§ 922(g).

> The proper interpretation of the statute thus turns on what
> it means for a defendant to know that he has "violate[d]"

§ 922(g). . . . § 922(g) makes possession of a firearm or
ammunition unlawful when the following elements are
satisfied: (1) a status element (in this case, "being an alien
. . . illegally or unlawfully in the United States"); (2) a
possession element ("to possess"); (3) a jurisdictional element
("in or affecting commerce"); and (4) a firearm element (a
"firearm or ammunition").

Id. at 2195-96.[13]

Jurisdictional elements aside, the text of § 922(g) lists the elements

that make a defendant's behavior criminal. Id. at 2196. Therefore, "[a]s

'a matter of ordinary English grammar,' we normally read the statutory

term ' "knowingly" as applying to all the subsequently listed elements of

the crime.' " Id. (citing Flores-Figueroa v. United States, 556 U.S. 646,

650 (2009)).

The Court continued therefore, that it was the defendant's status,

not merely his conduct, that made the difference. Id. at 2197. Without

knowledge of his status, the Court explained, the defendant may well

have lacked the intent needed to make his behavior wrongful. Id.

Instead, his behavior might have been an innocent mistake. Id. The

Court explained that it normally presumed Congress does not intend to

impose criminal liability on persons who, due to lack of knowledge, do

not have a wrongful mental state. Id. at 2198. The Court did not

---

[13] The Court noted, however that the word "knowingly" did not modify
the statute's jurisdictional element because jurisdictional elements do
not describe the evil Congress seeks to prevent, but rather simply ensure
the federal government has the constitutional authority to regulate the
defendant's conduct. Id. at 2196 (citing Luna Torres v. Lynch, 578 U.S.
___, 136 S. Ct. 1619, 1630-31 (2016)).

anticipate that proving a defendant's knowledge of his status would be burdensome, because "knowledge can be inferred from circumstantial evidence." Id.

The Court rejected the government's argument that because whether an alien was in the United States illegally was a question of law, not fact, the well-known maxim "ignorance of the law is no excuse" should therefore apply. Id. The Court explained:

> This maxim, however, normally applies where a defendant has the requisite mental state in respect to the elements of the crime but claims to be "unaware of the existence of a statute proscribing the conduct." 1 W. LaFave & A. Scott, Substantive Criminal Law § 5.1(a), p. 575 (1986). In contrast, the maxim does not normally apply where a defendant "has a mistaken impression concerning the legal effect of some collateral matter and that mistake results in his misunderstanding the full significance of his conduct," thereby negating an element of the offense. Ibid.; see also Model Penal Code, § 2.04, at 27 (a mistake of law is a defense if the mistake negates the "knowledge . . . required to establish a material element of the offense"). Much of the confusion surrounding the ignorance-of-the law maxim stems from "the failure to distinguish [these] two quite different situations." LaFave, Substantive Criminal Law, § 5.1(d), at 585.

Rehaif, 139 S. Ct. at 2198.

The Court summarized that, in Rehaif, the defendant's status as an alien "illegally or unlawfully in the United States" referred to a legal matter, but the legal matter was a collateral question of law. Id. A defendant who does not know he is an alien "illegally or unlawfully in the United States" does not have the guilty state of mind required by the statute. Id. The Court therefore reversed the Eleventh Circuit and

remanded for further proceedings.  Id. at 2200.  The Court concluded by

noting it expressed no view about what the government must prove to

establish a defendant's knowledge of status in respect to other § 922(g)

provisions that were not at issue in Rehaif.  Id.

In United States v. Hollingshed, 940 F.3d 410, 412 (8th Cir. 2019),

the defendant was convicted of being a felon in possession of a firearm in

violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Mr. Hollingshead

stipulated during the trial that he had a prior felony conviction, but, as

in Rehaif, the jury was not instructed that the government must prove

Mr. Hollingshead possessed a firearm *and* that he knew he belonged to

the relevant category of persons barred from possessing a firearm.  Id. at

415.  During the pendency of Mr. Hollingshead's direct appeal, the

United States Supreme Court issued the Rehaif decision.  Id.

The court began by stating that, in Rehaif, the Supreme Court

made clear it was expressing no view about what precisely the

government must prove to establish a defendant's knowledge of status in

respect to other § 922(g) provisions that were not at issue in that case.

Hollingshed, 940 F.3d at 415,  (citing Rehaif, 139 S. Ct. at 2200).

Mr. Hollingshed argued that, in light of Rehaif, there was insufficient

evidence to support his conviction or, in the alternative, the district

court's failure to instruct the jury regarding his knowledge of his

previous felony conviction constituted reversible error.  Hollingshed, 940

F.3d at 415.  Because Mr. Hollingshed failed to challenge the lack of a

85

jury instruction regarding his lack of knowledge of his felony conviction status, the court reviewed his claim for plain error.  Id.

Under this standard, the court found Mr. Hollingshed must show (1) an error; (2) that was obvious; (3) that affected his substantial rights; and (4) that seriously affected the fairness, integrity, or public reputation of judicial  proceedings.  Id. (citing United States v. Olano, 507 U.S. 725, 734 (1993)).

The court acknowledged that, unlike Mr. Rehaif, Mr. Hollingshed was a convicted felon.  Id.  Also, Mr. Hollingshed (like Mr. Sorensen) had entered into a stipulation at trial that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year. Id.  The court stated it would nevertheless "assume that Hollingshead's stipulation does not resolve the issue of whether he knew he was a felon."  Id.  Under that assumption, the court found, the absence of a jury instruction requiring the jury to find Mr. Hollingshed knew he was a felon was clear error under Rehaif.  Id. (citing Griffith v. Kentucky, 479 U.S. 314, 321 n.6 (1987)) (providing Supreme Court decisions in criminal cases apply to all cases pending on direct review).  The court found Mr. Hollingshed could not satisfy the third and fourth elements of the Olano plain error test because, given his previous conviction, sentence, and time spent in prison, those facts indicated Mr. Hollingshed knew he had been convicted of a "crime punishable by imprisonment for a term exceeding one year" when he possessed a firearm in 2015.  Id. at 416.

86

Therefore, he could not show a reasonable probability that but for the error, the outcome of the proceeding would have been different. Hollingshed, 940 F.3d at 416. Therefore, the failure to instruct the jury to make such a finding did not affect Mr. Hollingshed's substantial rights or the fairness, integrity, or public reputation of the trial. Id. (citing United States v. Benamor, 937 F.3d 1182, 1189 (9th Cir. 2019).[14]

Here, the parties agree that Rehaif applies to Mr. Sorensen's § 2255 application. See Docket No. 41, p. 25. The government asserts even applying Rehaif retroactively, there is no reason to vacate Mr. Sorensen's conviction.

During his 2016 trial, Mr. Sorensen, like Mr. Hollingshed, stipulated to the fact of his previous felony conviction.[15] Mr. Sorensen

---

[14] In Benamor the defendant was also convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). His case was pending on appeal when Rehaif was decided. Mr. Benamor also stipulated at trial that, on the date he was arrested for possessing the firearm in question, he had been convicted of a crime punishable by imprisonment for a term exceeding one year. Benamor, 937 F.3d at 1188. The court found no plain error in failing to instruct the jury that it must find Mr. Benamor knew he was a convicted felon because, among other reasons, Mr. Benamor had been convicted of several felonies in which sentences of more than one year had actually been imposed upon him. Id. at 1189.

[15] During trial, rather than introduce evidence of Mr. Sorensen's prior felony conviction, a stipulation was read into evidence: "United States of America vs. Shawn Russell Sorensen. Stipulation. United States of America, by and through its attorney, and the Defendant, by and through his attorneys, hereby stipulate and agree as follows: On or about December 2, 2002, Shawn Russell Sorensen was convicted of a crime punishable by imprisonment for a term exceeding one year. The parties also agree that the stipulation may be received into evidence at trial

now asserts, however, that he is entitled to a new trial under <u>Rehaif</u> regardless of his stipulation.  Mr. Sorensen now claims he believed his gun rights had been restored.  This is so, he says, because he had obtained a hunting license from 2012-2015, his voting rights had been restored in South Dakota, and he had a federal migratory waterfowl stamp.  Docket No. 35-4, ¶¶ 2-5.

In his brief, Mr. Sorensen cites 18 U.S.C. § 921(a)(20) in support of his assertion that he believed his gun rights had been restored at the time he possessed the firearm that was the subject of his 2016 federal conviction.  That statute states in relevant part:

> (20)  The term "crime punishable by imprisonment for a term exceeding one year" does not include—
>
> (A)  any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or
>
> (B)  any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.
>
> What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held.[16] Any

---

without any additional foundation or proof." <u>See</u> Trial Exhibit 119, TT (CR Docket No. 137), p. 399.

[16] South Dakota law regarding possession of a firearm by a person previously convicted of a felony states:

> 22-14-15.1. Possession of firearm by one with prior drug conviction—Felony—Exception.

> conviction which has been expunged, or set aside or for
> which a person has been pardoned or has had civil
> rights restored shall not be considered a conviction for
> purposes of this chapter, unless such pardon,
> expungement, or restoration of civil rights expressly
> provides that the person may not ship, transport,
> possess, or receive firearms.

See 18 U.S.C. § 921(a)(20).  Despite his current claim that he believed his

gun rights had been restored, the rationale of Hollingshed defeats

Mr. Sorensen's Rehaif claim on the merits.

First, though the jury in Mr. Sorensen's trial was not instructed

that the government needed to prove Mr. Sorenson knew he had

previously been convicted of a crime punishable by imprisonment for a

---

> No person who has been convicted of a felony  under chapter
> 22-42 or of a felony for a crime with the same elements in
> another state may possess or have control of a firearm. A
> violation of this section is a Class 6 felony. The provisions of
> this section do not apply to any person who was last
> discharged from prison, jail, probation, or parole, for a felony
> under chapter 22-42 more than five years prior to the
> commission of the principal offense and is not subject to the
> restrictions in § 22-14-15.
>
> Source:  SL 1998, Ch. 130, § 2; SDCL, § 22-14-30; SL 2005,
> Ch. 120, §§ 267, 268.
>
> Recall that Mr. Sorensen's 2002 conviction was a felony pursuant
> to SDCL 22-42-5.  See Docket No. 2-2.  In his brief, Mr. Sorensen
> concedes he was sentenced to prison for his 2002 conviction in 2002, but
> was not finally discharged from parole for that violation until August of
> 2011.  See Docket 35, p. 24 n.5.  Therefore, not more than five years had
> passed between the time he was "last discharged" from parole and the
> time (May, 2016) when he possessed the firearm that is the subject of his
> conviction in this case.  Though he now claims he *believed* his gun rights
> had been restored, he does not and cannot claim his rights *actually had*
> been restored under South Dakota law.

term exceeding one year, just like Mr. Hollingshed, Mr. Sorensen cannot show that he did not actually know.  Just like Mr. Hollingshed, Mr. Sorensen entered into a stipulation stating that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year.  Just like Mr. Hollingshed, Mr. Sorensen had entered into a guilty plea as to that previous felony charge.  <u>See</u> Docket 2-2.  Just like Mr. Hollingshed, Mr. Sorensen was actually sentenced to serve more than one year in prison as a result of said previous felony conviction.  <u>Id.</u>  And, just like Mr. Hollingshed, Mr. Sorensen served extra prison time as a result of said conviction when his parole was later revoked.  <u>See</u> PSR, CR Docket No. 122, ¶ 46.  <u>See also</u>, <u>United States v. Cox</u>, 796 F. App'x 322, 322-23 (8th Cir. 2020) (reaching the same conclusion as <u>Hollingshed</u> because the defendant spent years in prison); <u>United States v. Welch</u>, 951 F.3d 901, 907 (8th Cir. 2020) (same); <u>United States v. Coleman</u>, 961 F.3d 1024, 1030 (8th Cir. 2020) (same); <u>United States v. Seltzer</u>, 789 F. App'x 559, 561 (8th Cir. 2020) (same); <u>United States v. Crumble</u>, 965 F.3d 642, 644-45 (8th Cir. 2020) (same).

The defendants in <u>Coleman</u> and <u>Crumble</u> made claims very similar to the claim Mr. Sorensen makes here: that they believed their civil rights had been "restored."  In each case, however, such a claim was insufficient to prevail on the theory that the conviction should be vacated pursuant to <u>Rehaif</u>.

In <u>Coleman</u>, the defendant asserted he "may have" believed his prior felony convictions had been expunged or his civil rights restored. <u>Coleman</u>, 961 F.3d at 1030. The court found this claim insufficient to vacate the conviction because the proper inquiry was simply whether the defendant "knew he was a convicted felon at the relevant time." <u>Id.</u>

In <u>Crumble</u>, the defendant argued that, based on 18 U.S.C. § 921(a)(20), he "could have reasonably believed" that a safe harbor applied to him such that he no longer knew he had been convicted of a crime punishable by imprisonment for a term exceeding one year. <u>Crumble</u>, 965 F.3d at 645. The court rejected Mr. Crumble's argument, however, because Mr. Crumble

> offer[ed] no evidence to show that was the case here. It was Crumble's burden to prove that his substantial rights were affected by the <u>Rehaif</u> error. . . . Merely identifying a defense theory—a possibility—is not sufficient to show a reasonable *probability* of success without any evidence that the defense theory would, in fact, apply in this case.

<u>Crumble</u>, 965 F.3d at 645.

As such, the court rejects Mr. Sorensen's current claim that <u>Rehaif</u> entitles him to relief because he mistakenly believed his gun rights had been restored. The statute cited in Mr. Sorensen's brief as support for his claim is the same as in <u>Crumble</u> (18 U.S.C. § 921(a)(20)). If, as Mr. Sorensen now asserts, at the time he possessed the firearm and, more importantly, at the time of his trial in October, 2016, Mr. Sorensen believed his civil rights had been restored under South Dakota law, then his 2002 South Dakota conviction *no longer fit the definition* of a "crime

91

punishable by imprisonment for a term exceeding one year." But at his 2016 trial, Mr. Sorensen, without objection, stipulated the 2002 conviction met this definition.

Third, Mr. Sorensen seems to argue that <u>Rehaif</u> stands for the proposition that his *mistake* about whether his gun rights had been restored could negate the validity of his 2016 conviction under § 922(g) and § 924(a)(2). But this idea has been soundly rejected by many courts—including courts in this district and in the Eighth Circuit. As recently as December 2019, it was addressed in <u>United States v. Burning Breast</u>, No. 3:19-CR-30110, 2019 WL 6650474, at *3 (D.S.D. Dec. 6, 2019). In that case, the defendant was charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). <u>Id.</u> at *1. Mr. Burning Breast requested a jury instruction that would have required the government to prove beyond a reasonable doubt that he knew that his prior felony conviction prohibited him from possessing firearms or that he could not reasonably believe his civil rights had been restored. <u>Id.</u> The district court found the instruction was an incorrect statement of the law, and refused to so instruct the jury. <u>Id.</u> at *3.

In <u>Burning Breast</u>, the court explained that, after <u>Rehaif</u>, circuit courts have interpreted §§ 922(g)(1) and 924(a)((2) to require the government to prove that the defendant "knew he was a felon," or "knew that he had been 'convicted' of a crime 'punishable by imprisonment for a

term exceeding one year.'" Burning Breast, 2019 WL 6650474, at *2,

(quoting United States v Smith, 939 F.3d 612, 614 (4th Cir. 2019)). See

also United States v. Davies, 942 F.3d 871, 874 (8th Cir. 2019); United

States v. Benamor, 937 F.3d 1182, 1186, (9th Cir. 2019)).

But, the court further explained, Rehaif did not require the

government to prove the defendant knew that he was prohibited from

possessing a firearm—but rather only that he "knew he belonged to the

relevant category of persons barred from possessing a firearm." Burning

Breast, 2019 WL 6650474 at *2 (quoting Rehaif, 139 S. Ct. at 2200). But

several courts have held the government does *not* need to prove the

defendant knew his status barred him from possessing a firearm. Id.

(citing United States v. Bowens, 938 F.3d 790, 797-98 (6th Cir. 2019);

United States v. Kueth, No. 8:18CR244, 2019 WL 6037078, at *1-2

(D. Neb. Nov. 14, 2019); United States v. Phyfier, No. 2:17cr482, 2019

WL 3546721, at *3 (M.D. Ala. Aug. 8, 2019); United States v. Gear,

No. 17-000742, 2019 WL 4396139 at *8 (D. Haw. Sept. 13, 2019)). And,

the court explained, the courts have also held that evidence a defendant

did not know he could not possess a firearm is irrelevant in a

prosecution under 18 U.S.C. § 922(g). Burning Breast, 2019 WL

6650474, at *2 (citing  Phyfier, 2019 WL 3546721, at *3-4; United States

v. Collins, No. 5:18-cr-00068, 2019 WL 3432591, at *2-3 & n.2

(S.D. W. Va. July 30, 2019)).

In <u>Bowens</u>, the defendants were convicted in May 2017 of possessing firearms while being unlawful users of a controlled substance. <u>Bowens</u>, 938 F.3d at 792. Their case was pending on appeal when <u>Rehaif</u> was decided, and they argued on direct appeal that the district court plainly erred by failing to instruct the jury that they must have known they were unlawful users of a controlled substance in order to be guilty of violating 18 U.S.C. § 922(g)(3). <u>Id.</u> at 796. The court agreed that, in light of <u>Rehaif</u>, the lack of an instruction on the defendants' knowledge regarding this element may have been error. <u>Id.</u> But, even assuming <u>Rehaif</u> applied, any error was not plain because the defendants could not show that, but for the error, the result would have been different. <u>Id.</u> at 797. This was because the jury heard evidence that defendants were arrested with marijuana in their possession, and defendants had posted pictures, comments and videos of themselves using marijuana. <u>Id.</u>

The defendants, however, argued that, even if they knowingly used marijuana, <u>Rehaif</u> required more—it required that the government prove they knew they were *prohibited from possession of a firearm* because they were users of unlawful substances. <u>Id.</u> In other words, that they knew of their status *as a prohibited person.* <u>Id.</u> The court agreed that such a jury instruction might have made a difference, because though it "border[ed] on fantastical to suggest that defendants were unaware they were smoking marijuana, or that marijuana was a controlled substance,

94

it is at least plausible that they were unaware that they were prohibited from possessing firearms under a subsection of 18 U.S.C. § 922(g) due to their regular and repeated drug use." Id.

The Bowens court rejected the defendants' broad interpretation of Rehaif, stating, "[s]uch knowledge however, is not, and cannot be, what Rehaif requires." Id. The defendants' interpretation of Rehaif, the court explained, ran headlong into the venerable maxim that ignorance of the law is no excuse. Id. "Rehaif did not graft onto § 922(g) an ignorance-of-the-law defense by which every defendant could escape conviction if he was unaware of this provision of the United States Code." Id. The Bowens court explained it this way: Rehaif stands for the proposition that the government arguably must prove defendants knew they were unlawful users of a controlled substance, but not, as they argued, that they knew unlawful users of controlled substances were prohibited from using firearms under federal law. Id.

The Burning Breast court concluded that "[e]vidence that Burning Breast either didn't know the law prohibited him from possessing a firearm or mistakenly thought himself exempt from the law would not negate the requisite mental state and is not a defense." Burning Breast, 2019 WL 6650474, at *3. The court explained it was an incorrect statement of the law to place the burden on the government to show that Mr. Burning Breast knew his civil rights had not been restored. Id. But, "[o]f course, if [he] had a state felony conviction . . . [and] had his civil

rights restored, then he would not have a qualifying felony conviction."
Id. (citing United States v. Knapp, No. CR-19-03-H-CCL, 2019 WL
6493467, at *2-3 (D. Mont. Dec. 3, 2019)).

Knapp is significant here.  In Knapp, the defendant was tried on
charges of being a felon in possession of a firearm in October 2019 (after
the Rehaif decision).  The district court instructed the jury that the
government must prove the following elements beyond a reasonable
doubt: (1) the defendant knowingly possessed firearms; (2) the firearms
had been shipped from one state to another; (3) at the time the defendant
possessed the firearms the defendant had been convicted of a crime
punishable by imprisonment for a term exceeding one year; and (4) at the
time the defendant possessed the firearms he knew that he had been
convicted of a crime punishable by imprisonment for a term exceeding
one year.  Id. at *2.  Mr. Knapp was convicted at trial, and made a post-
trial motion for judgment of acquittal under FED. R. CRIM. P. 29(c).  Id. at
*1.

Mr. Knapp disputed that he knew he had been convicted of a crime
punishable by imprisonment for a term exceeding one year.  Id.  He had
argued at trial and in his motion for judgment of acquittal that he did not
know he was a convicted felon because he believed his civil rights had
been restored following his release from prison.  Id. at *2.  At trial, the
court provided the jury the following Ninth Circuit model instruction to
explain the requirement that Mr. Knapp knew about his prior conviction:

> [A]n act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident.  The government is not required to prove that the defendant knew that his acts or omissions were unlawful.  You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

Id. at *2.

At Mr. Knapp's request, the court also instructed the jury that any "conviction that has been expunged, set aside, or for which a person has been pardoned or had his civil rights restored shall not be considered a conviction for purposes of a federal firearm violation, unless the pardon, expungement, or restoration of civil rights expressly provides the person may not possess firearms." Id.  Given all this, the court found the government had sufficient evidence to support the jury's finding as to the fourth element.  Id.

During its case-in-chief, the government had offered the parties' stipulation that Mr. Knapp had prior convictions, along with testimony from Special Agent Sprenger that the convictions were for felonies and that Mr. Knapp was sentenced to terms of imprisonment for more than one year.  Id.  The court found, therefore, the government offered sufficient evidence to show Mr. Knapp knew he had been convicted of a crime punishable by a term of imprisonment exceeding one year.  Id.

After the government rested, Mr. Knapp testified.  Id. at *3.  He explained it was his understanding that, after he was released from prison, his civil rights, including his right to bear arms, had been

restored.  Id.  He offered his discharge paperwork from the Colorado

Department of Corrections as a trial exhibit to support his claim.  Id.

But, the court noted, the discharge from the Department of Corrections

made no mention of restoration of Mr. Knapp's "civil rights."  It referred

only to Mr. Knapp's unconditional discharge from the custody of the

Colorado Department of Corrections.  Id.  The court denied Mr. Knapp's

motion for judgment of acquittal, and found the jury's guilty verdict was

supported by sufficient evidence as to every element of the offense

charged.  Id.  See also United States v. Hoff, No. 14-cr-109, 2019 WL

5065134, at *2 (D. Minn. Oct. 9, 2019).

Mr. Hoff, like Mr. Sorensen, was convicted of being a felon in

possession of a firearm.  Id.  He filed a § 2255 motion, arguing his

conviction was invalid after Rehaif.  Id.  Mr. Hoff had pleaded guilty to

the felon in possession charge and, in the process, admitted he was a

convicted felon.  Id. at *1.  In fact, during his plea colloquy, he admitted

he had been convicted of multiple felonies that were punishable by more

than one year in jail.  Id.  In his § 2255 proceeding, however, Mr. Hoff

asserted his underlying conviction for being a felon in possession of a

firearm was invalid because, in reality, his civil rights had been restored.

Id. at *1.  As a result, he argued, he did not possess the requisite *mens

rea* for the crime.  Id.

In support of his argument, Mr. Hoff explained he had received a

letter from the Department of Corrections (DOC) before the date of his

98

guilty plea restoring his civil rights.  Id.  Thus, he argued, his plea was invalid because he was not in fact a felon at the time he pleaded guilty. Id.  The government could not have proven he knew he was a felon under Rehaif, he argued, because he was not in fact a felon at the time of his plea.  Id.  But the Hoff court, like the Knapp court, rejected these claims because Mr. Hoff was mistaken about his restoration of civil rights.  Hoff, 2019 WL 5065134, at *2.  The DOC cannot restore a felon's civil rights under Minnesota law.  Id.  Instead, a court order is required to restore those rights.  Id. (citing Minn. Stat. § 609.165, subd. 1a).  Because the court found there could be "no question" that, under Minnesota law, a court order was required to restore his civil rights and that he had produced no such order, Mr. Hoff's "bare-bones" allegation did not suffice to establish a claim under § 2255.  Id.  The court concluded Mr. Hoff's plea colloquy established he had all the knowledge Rehaif required.  Id. at *1.  That is, he knew he had been convicted of a crime punishable by imprisonment of more than one year.  Id.

The significance of Knapp and Hoff is that in neither case had the defendant's civil rights *actually* been restored.  Therefore, in each case, the defendant's status as a previously convicted felon was unaffected. That the defendant *may have been mistaken or claimed to have been mistaken* about the operation of the underlying state law that could have restored his civil rights was unavailing to his argument that he did not know he had previously been convicted of a crime punishable by more

99

than one year in prison.  The same is true for Mr. Sorensen in this case.
The court respectfully recommends that the government's motion to
dismiss Mr. Sorenson's claim that his sentence was imposed in violation
of Rehaif v. United States, 139 S. Ct. 2191 (2019), be granted and the
claim dismissed.

## G.    A Limited Evidentiary Hearing is Warranted

"While '[a] petitioner is entitled to an evidentiary hearing on a
section 2255 motion unless the motion and the files and the records of
the case conclusively show that [he] is entitled to no relief,' no hearing is
required 'where the claim is inadequate on its face or if the record
affirmatively refutes the factual assertions upon which it is based.' " New
v. United States, 652 F.3d 949, 954 (8th Cir. 2011) (quoting Anjulo-Lopez
v. United States, 541 F.3d 814, 817 (8th Cir. 2008)).

"A district court may deny an evidentiary hearing where (1)
accepting the petitioner's allegations as true, the petitioner is not entitled
to relief, or (2) 'the allegations cannot be accepted as true because they
are contradicted by the record, inherently incredible, or conclusions
rather than statements of fact.' " Guzman-Ortiz v. United States, 849
F.3d 708, 715 (8th Cir. 2017) (quoting United States v. Sellner, 773 F.3d
927, 929-30 (8th Cir. 2014)).

Here, no evidentiary issue is warranted on any claim *except*
Mr. Sorenson's claim that his Arizona conviction is not a predicate
offense under § 841(b)(1)(A) and the corresponding claim that counsel

were ineffective for failing to raise this issue at the trial and appellate levels. The court recommends an evidentiary hearing be held limited to these two issues. The court recommends no evidentiary hearing be held on any of Mr. Sorenson's other claims. Mr. Sorensen's other claims all fail on the merits given the settled record before the court, or are procedurally inaccessible. There are no issues of fact or credibility to be determined as to these other claims.

## CONCLUSION

Based on the foregoing law, facts and analysis, this magistrate judge respectfully recommends that the government's motion to dismiss [Docket No. 26] be granted in part and denied in part. The court recommends that all of Mr. Sorensen's claims for relief be dismissed except the claims that his Arizona conviction is not a proper predicate offense under 21 U.S.C. §§ 841(b)(1)(A), 851, and 802(44) and that trial and appellate counsel were ineffective for failing to raise this issue.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. See FED. R. CIV. P. 72; 28 U.S.C. § 636(b)(1)(B). Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Id. Objections must be timely and specific in order to require *de novo*

review by the district court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir.

1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

     DATED September 22, 2020.

                   BY THE COURT:

                   VERONICA L. DUFFY
                   United States Magistrate Judge