UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SHAWN RUSSELL SORENSEN,<br><br>Movant,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | 4:19-CV-04190-KES<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

This matter is before the court on Shawn Russell Sorensen's
motion to vacate, correct, or set aside his sentence pursuant to 28 U.S.C.
§ 2255. See Docket No. 1.[1] Respondent the United States of America
("government") moved to dismiss Mr. Sorensen's § 2255 petition without
holding an evidentiary hearing. See Docket No. 26. A round of briefing
occurred before this magistrate judge and then again before the district
court on objections to this court's report and recommendation. There
now remains a single issue for which an evidentiary hearing is required.
Docket No. 51 at pp. 14-17, 28. Mr. Sorensen's case was referred to this
magistrate judge for holding an evidentiary hearing on that singular

---

[1] In this opinion, the court cites to documents filed in this civil habeas
case by simply citing the docket number of the document. The court
cites to documents in Mr. Sorensen's underlying criminal case, United
States v. Sorensen, 4:16-cr-40062-KES-1 (D.S.D.), by citing to the docket
number in the criminal case preceded by "CR."

issue and recommending a disposition pursuant to 28 U.S.C.

§ 636(b)(1)(A) and (B) and pursuant to the October 16, 2014, standing

order of the Honorable Karen E. Schreier, United States District Judge.

## FACTS

### A.    Proceedings in the District Court

#### 1.    Pretrial

Mr. Sorensen was indicted by a federal grand jury in the District of

South Dakota on May 10, 2016, and charged with conspiracy to

distribute 500 grams or more of a mixture or substance containing

methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  See

CR Docket No. 1.  Gayle Hartz was named as Mr. Sorensen's co-

conspirator in count 1 of the indictment.  A superseding indictment was

filed on September 20, 2016, which added a count to the indictment

charging Mr. Sorensen with one count of possessing a firearm after

having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).

See CR Docket No. 70.

Attorney Clint Sargent was appointed to represent Mr. Sorensen at

his initial appearance on May 23, 2016.  See CR Docket No. 18.

Thereafter, on June 7, 2016, Mr. Sargent withdrew because

Mr. Sorensen retained private counsel, attorneys Rick Ramstad, Bruce

Rivers, and Coley Grostyan, the latter two of which are from Minneapolis,

Minnesota.  See CR Docket Nos. 36, 37, 39, 40, 41, and 89.

On September 16, 2016, the government filed an information and notice pursuant to 21 U.S.C. § 851 of its intent to seek an increased punishment based on Mr. Sorensen's prior convictions for felony drug offenses pursuant to 21 U.S.C. § 841(b)(1)(A), as defined in 21 U.S.C. § 802(44).  See CR Docket No. 66.  The effect of the government's information was that Mr. Sorensen's mandatory minimum sentence, if convicted, was life in prison.

Mr. Sorensen's co-defendant, Ms. Hartz, entered into a plea agreement before trial.  See CR Docket No. 67.  Mr. Sorensen proceeded to a jury trial on October 4, 5, and 6, 2016.  See CR Docket No. 137 (hereinafter "JT Trnscpt.").  At trial, twenty-two witnesses testified for the government including Ms. Hartz and Mr. Sorensen's wife, Dawn Sorensen.  See CR Docket No. 137-1 at pp. 78-114, 167-186 (JT Trnscpt. Vol. II at pp. 254-90, 343-62).

### 2.    The Trial

At trial, the evidence established the following:[2]  On April 25, 2016, a United States Postal Inspector in Minneapolis applied for and received a search warrant for a package sent from a post office in Arizona, addressed to "Gayle Hartz, 404 S. Donaldson, Luvern [sic] Minn. 56156."

---

[2] These are the facts almost verbatim as they were recited in the BACKGROUND section of the Eighth Circuit opinion on Mr. Sorensen's direct appeal, United States v. Sorensen, 893 F.3d 1060, 1063-64 (8th Cir. 2018).  In his § 2255 motion and supporting brief, Mr. Sorensen contests that court's legal conclusions, but he has not contested the accuracy of the background facts as recited in the opinion.

3

A certified drug dog alerted to the odor of narcotics.  The return label on the package read, "Dave Beckman, 13580 W. Port Royale, Suprise [sic] AZ. 85379."  Upon searching the package pursuant to the warrant, the postal inspector found clothing, toilet paper, paper towels, 192 grams of cocaine, and over four kilograms of methamphetamine wrapped in bundles of plastic and black electrical tape.  The postal inspector contacted a counterpart in Sioux Falls, South Dakota, which is approximately 31 miles from Luverne, Minnesota, and requested that he conduct a controlled delivery of the package, which the Sioux Falls inspector did.

Before the package was delivered to Ms. Hartz's home, an anticipatory search warrant was granted for her home and her person. After the controlled delivery to her home in Luverne, Minnesota, officers observed a vehicle drive away from Ms. Hartz's home.  An officer stopped the vehicle and arrested the driver, who was Ms. Hartz.  Meanwhile, other officers executed the warrant to search Ms. Hartz's home, and located the unopened delivered package.  Ms. Hartz informed the officers she had received the package on behalf of Shawn Sorensen.  Ms. Hartz had communicated with Mr. Sorensen via text message prior to its delivery.  Just after the package was delivered, Ms. Hartz texted Mr. Sorensen, stating, "Its here.  So get ur butt here."  Mr. Sorensen replied, "I'm on my way."

The Minnesota agents informed members of the Sioux Falls Area
Drug Task Force (SFADTF) about Mr. Sorensen's involvement.  SFADTF
began conducting surveillance at Mr. Sorensen's residence in Sioux
Falls.  The SDADTF and Minnesota authorities cooperated to follow
Mr. Sorensen from his home in Sioux Falls to Ms. Hartz's home in
Luverne, Minnesota.  Officers arrested Mr. Sorensen immediately upon
his entrance into Ms. Hartz's home in Luverne.

After his arrest, officers found $15,700 in cash in Mr. Sorensen's
pocket, bundled into three separate bundles.[3]  CR Docket No. 137-1 at
pp. 30-31 (JT Trnscpt. Vol. II at pp. 206-07).  A search warrant of
Mr. Sorensen's Sioux Falls home yielded methamphetamine, drug
paraphernalia, and a USPS mailing label for what appeared to be a
different package Mr. Sorensen mailed to Ms. Hartz on September 21,
2015.  That label's return address was also "Dave Beckman" in Phoenix,
Arizona.

A search warrant was also obtained for Mr. Sorensen's vehicle.
That search uncovered Mr. Sorensen's driver's license, treasury checks
addressed to Mr. Sorensen, four cell phones, methamphetamine,
marijuana, cocaine, other drug substances, three firearms, drug

---

[3] The money found in Mr. Sorensen's pocket was denominated as follows:
74 $100 bills; 90 $50 bills; 189 $20 bills; 1 $10 bill; 1 $5 bill; and 5 $1
bills.  CR Docket No. 100-1 at p. 36 (Trial Exhibit 39).  One of the three
bundles contained $800 cash and the other two contained the balance of
$14,900 of the money.  CR Docket No. 137-1 at pp. 30-31 (JT Trnscpt.
Vol. II at pp. 206-07.

paraphernalia, and the USPS package mailing label and printed receipt for the intercepted package. Also in Mr. Sorensen's vehicle was his wallet containing $510 in cash.[4] CR Docket No. 100-1 at p. 18 (Trial Exhibit No. 24).

The inspectors extracted data from two of Mr. Sorensen's cell phones. The extraction reports and physical examinations showed Mr. Sorensen had "Gayle" saved as a contact in two of the phones which were displayed to the jury at trial. He saved Ms. Hartz' address under each of the "Gayle" contact listings, and misspelled "Luverne" as "Luvern," just like the label on the intercepted package. The only other address in each of the phones was the exact return address, including the same misspelling of the City "Surprise" as "Suprise" as it also appeared on the label of the intercepted package. The inspection of the phones also confirmed the text messages between Ms. Hartz and Mr. Sorensen regarding the intercepted package.

The inspectors also received proof Mr. Sorensen had called the ASK USPS hotline to check the status of the intercepted package. Additionally, the postal inspectors discovered USPS records showing packages sent from Arizona to Ms. Hartz at addresses in Sioux Falls and Luverne on at least six different occasions. Also, flight records revealing that Mr. Sorensen took flights from Sioux Falls to Phoenix on dates

---

[4] The money found in Mr. Sorensen's wallet in his vehicle was denominated as follows: 4 $100 bills; 1 $50 bill; and 3 $20 bills. CR Docket No. 100-1 at p. 18 (Trial Exhibit 24).

corresponding with delivery of many of these packages were also discovered.

At trial, Ms. Hartz provided extensive testimony about her involvement with Mr. Sorensen. She testified that she met Mr. Sorensen in the early 2000s when she and her boyfriend would consume methamphetamine with Mr. Sorensen and his wife. Ms. Hartz began to work for Mr. Sorensen in 2014, after she lost her job. She accepted packages for Mr. Sorensen in exchange for money and drugs. Ms. Hartz testified she accepted approximately six packages containing methamphetamine for Mr. Sorensen.

A USPS forensic latent fingerprint analyst testified about latent prints found on the adhesive side of the packing tape on the intercepted package. She identified three prints on the tape which matched Mr. Sorensen's known fingerprints.

At trial, Mr. Sorensen's wife, Dawn Sorensen, testified. CR Docket No. 137-1 at p. 167 (JT Trnscpt. Vol. II at p. 343). On cross-examination, Ms. Sorensen testified her husband may have borrowed money from Larry Kuhnert to fix a black Ford truck that had been in an accident. Id. at pp. 182-83 (JT Trnscpt. Vol. II at pp. 358-59). She testified Mr. Kuhnert had the means to make such a loan to Mr. Sorensen and that they had known each other for a long time such that Mr. Kuhnert would be willing to make such a loan. Id.

During the government's initial closing argument, counsel argued the following evidence: Mr. Sorensen's multiple trips to Arizona, which coincided with packages being mailed from Arizona to Ms. Hartz; text messages from Mr. Sorensen's phone to Ms. Hartz's phone discussing drug shipments and pickups; United States Postal Service mailing labels and receipts found in Mr. Sorensen's possession; Mr. Sorensen's fingerprint being found on the last package delivered to Ms. Hartz; and the firearms found in Mr. Sorensen's vehicle. CR Docket No. 137-2 at pp. 25-41 (JT Trnscpt. Vol. III at pp. 445-61). The government never mentioned the $15,700 in cash found on Mr. Sorensen's person on the date he was arrested in its initial argument. Id.

In rebuttal close, the government argued that Mr. Sorensen supposedly lived on a disability income of $733 per month, but then argued this was inconsistent with the large amount of expensive drugs found in his vechicle, with his ability to make multiple trips to Arizona, mail multiple packages with substantial postage costs, to buy multiple pairs of $90 jeans, and to have $15,700 cash on his person and $510 cash in his wallet. CR Docket No. 137-2 at p. 54 (JT Trnscpt. Vol. III at p. 474). The alternative, the government suggested, was that Mr. Sorensen was involved in drug trafficking and this is where he obtained the wherewithal to do and buy all of these things. Id.

The jury convicted Mr. Sorensen on both counts of the superseding indictment. See CR Docket No. 97. After trial, but before sentencing,

8

Mr. Sorensen dismissed attorneys Ramstad, Rivers, and Grostyan.  See CR Docket Nos. 108-110.  Mr. Sorensen retained his original attorney, Clint Sargent, to represent him for sentencing.  Id.

On April 25, 2017, the district court sentenced Mr. Sorensen to life in prison for his drug distribution conspiracy conviction, which sentence was mandatory because of the effect of the government having filed its § 851 information.  See CR Docket No. 148.

**B.    Mr. Sorensen's Remaining Allegation in his § 2255 Motion**

The sole remaining claim Mr. Sorensen asserted in his request for § 2255 relief is that trial counsel was ineffective in failing to investigate and present at least the testimony of Larry Kuhnert.

**C.    Evidence Adduced at the Hearing**

Pursuant to the district court's order (Docket No. 51 at p. 28), this magistrate judge held an evidentiary hearing on Mr. Sorensen's claim. Four witnesses testified at the hearing.  The evidence adduced at the hearing differed from the evidence presented to the district court on objections to this magistrate judge's previously-issued recommendation.

Specifically, at the time objections were made to the district court, Mr. Sorensen presented an affidavit to the district court from Larry Kuhnert stating that he had never been contacted by Mr. Sorensen's lawyers and asked about his testimony.[5]  See Docket No. 50-1.  However,

---

[5] This magistrate judge did not have the benefit of Mr. Kuhnert's affidavit at the time the original recommendation was made on Mr. Sorensen's § 2255 motion.

at the evidentiary hearing held on this matter, Mr. Kuhnert testified that

Mr. Sorensen's lawyers had contacted him on two occasions:  once prior

to trial by telephone and once during trial in a witness room at the

courthouse.

      Mr. Kuhnert testified he told the lawyers on both occasions that he

had loaned Mr. Sorensen cash so that Mr. Sorensen could pay

Mr. Kuhnert's brother for some work done on a Ford Bronco owned by

Mr. Sorensen.  At the time he spoke to Mr. Sorensen's lawyers,

Mr. Kuhnert testified he had loaned Mr. Sorensen money, but could not

recall the amount.  At the evidentiary hearing, however, Mr. Kuhnert

testified the amount he loaned Mr. Sorensen was $14,000 and that he

was to pay the loan back to Mr. Kuhnert when he sold the Bronco.

      Mr. Kuhnert testified he told the lawyers he was willing to testify to

this at trial, but the lawyers never called him as a witness.  Mr. Kuhnert

could not remember the lawyers' names, but he referenced the person he

talked to as the "lawyer from Minneapolis." Both[6] of Mr. Sorensen's trial

attorneys' offices were in Minneapolis, Minnesota.

      Mr. Kuhnert testified at the evidentiary hearing that he never knew

Mr. Sorensen had a criminal history and he refused to believe it.

Mr. Kuhnert sat through all three days of trial and heard all the evidence

against Mr. Sorensen, but he flatly rejected it.

---

[6] Mr. Ramstad was present for jury selection then was excused for the
remainder of trial.  CR Docket No. 137 at pp. 31, 38 (JT Trnscpt. Vol. I at
pp. 31, 38).

Mr. Sorensen also testified at the evidentiary hearing that
Mr. Kuhnert had loaned him $14,000 in cash to get his 1971 Ford
Bronco repaired. He testified he asked his lawyers to call Mr. Kuhnert as
a witness at his trial to help explain the $15,700 in cash he had on his
person upon his arrest.

Both of Mr. Sorensen's trial attorneys, Coley Grostyan and Bruce
Rivers, testified at the evidentiary hearing. Mr. Grostyan confirmed that
Mr. Sorensen had told his lawyers about the loan from Mr. Kuhnert and
wanted Mr. Kuhnert to testify at trial. Mr. Grostyan had a vague
recollection of talking to Mr. Kuhnert by telephone prior to the trial and
discussing calling him as a witness with Mr. Rivers.[7] Ultimately,
Mr. Grostyan testified as a matter of strategy the lawyers decided not to
call Mr. Kuhnert as a witness for two reasons: (1) the cash found on
Mr. Sorensen upon his arrest was a very small part of the government's
case against him and (2) there was a risk that the jury could have
received the evidence from Mr. Kuhnert differently than counsel intended
it be received. Mr. Grostyan testified that you don't want to lose your
credibility with the jury, and he felt the evidence against Mr. Sorensen
was so overwhelming that presenting Mr. Kuhnert's testimony on such a

---

[7] Mr. Grostyan did not have a document in his file memorializing this
contact with Mr. Kuhnert. He attempted to obtain cell phone records
that would document the contact but was told by his phone company
that they did not have records on his phone dating back that far.

minor part of the government's case might be viewed by the jury as "grasping at straws."

Mr. Rivers remembered the facts surrounding Mr. Kuhnert's facts, but did not remember Mr. Kuhnert's name specifically. Mr. Rivers testified that he and Mr. Grostyan talked about Mr. Kuhnert's testimony at length, including discussing it with Mr. Sorensen. Mr. Rivers felt the cash was not an essential part of the government's case and that Mr. Kuhnert's testimony presented a "double-edged sword" in that the jury might think Mr. Sorensen took Mr. Kuhnert's money, which was supposed to be used to get his Bronco out of the shop, to instead bring it to a drug deal to buy drugs. In addition, Mr. Rivers testified that Mr. Sorensen had the cash on his person stored in three separate bundles, which was inconsistent with borrowing it from Mr. Kuhnert. Mr. Rivers testified he and Mr. Grostyan discussed this issue with Mr. Sorensen, and Mr. Sorensen was in agreement with the lawyers' decision not to call Mr. Kuhnert to testify.

## DISCUSSION

**A.    Ineffective Assistance of Counsel Claims**

### 1.    Standard Applicable to Ineffectiveness Claims

The district court set forth the applicable standard for Mr. Sorensen's claim that counsel was ineffective for failing to investigate and to call Larry Kuhnert as a witness at trial:

> In order to establish ineffective assistance of counsel, a petitioner must meet the two-pronged standard articulated

12

by the United States Supreme Court in <u>Strickland v. Washington</u>.  <u>See</u> 466 U.S. 668, 687 (1984).  "First, the [petitioner] must show that counsel's performance was deficient."  <u>Id.</u>  This "performance prong" requires a petitioner to show that counsel's representation was deficient and "fell below an objective standard of reasonableness."  <u>Id.</u> at 687-88.  To show deficiency, a petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  <u>Ragland v. United States</u>, 756 F.3d 597, 599-600 (8th Cir. 2014) (quoting <u>Strickland</u>, 466 U.S. at 687).  This court must assess "whether counsel's assistance was reasonable considering all the circumstances."  <u>Strickland</u>, 466 U.S. at 688.

There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "  <u>Id.</u> at 689 (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)).  "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  <u>Id.</u> at 690.

* * *

When determining whether counsel's performance was deficient, "[t]he decision not to call a witness is a virtually unchallengeable decision in trial."  <u>United States v. Staples</u>, 410 F.3d 484, 488 (8th Cir. 2005) (internal quotation omitted).  But reasonable trial strategy involves "choices made after thorough investigation of law and facts relevant to plausible options . . . and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  <u>Francis v. Miller</u>, 557 F.3d 894, 901 (8th Cir. 2009) (quoting <u>Strickland</u>, 466 U.S. at 690-91).  "[T]he strength of the general presumption that counsel engaged in sound trial strategy 'turns on the adequacy of counsel's investigation.' "  <u>Id.</u> (quoting <u>White v. Roper</u>, 416 F.3d 728, 732 (8th Cir. 2005)).

<u>See</u> Docket No. 51 at pp. 5-6, 15.

13

2.    **Application of <u>Strickland</u> to Counsel's Decision**

a.    **Deficient Conduct**

Given the different record presented at the evidentiary hearing in this matter, the court finds counsel's representation of Mr. Sorensen regarding Larry Kuhnert's testimony was not deficient.  First, as both counsel noted, the government's evidence against Mr. Sorensen was overwhelming.  The government had compiled data showing Mr. Sorensen made trips to Arizona during the precise times when multiple packages were mailed from Arizona to Gayle Hartz's house.  The government showed that Mr. Sorensen had documentation in his vehicle and at his home showing he had paid for those packages to be mailed.

Regarding the package delivered on the day of Mr. Sorensen's arrest, the government presented evidence that Mr. Sorensen had documentation for the mailing of this package from Arizona, had contacted the United States Postal Service about the location of the package, his fingerprint was on the tape used to seal the package up, and he and Gayle Hartz texted each other about the package and made arrangements for him to come get it at her home.

In addition to the $15,700 in cash Mr. Sorensen had on him at the time of his arrest, he had another $510 in cash in his wallet in his vehicle parked outside Ms. Hartz's house.  In that vehicle, he also had a wide assortment of drugs, the value of which was significant.

14

At the time Mr. Kuhnert talked to the lawyers, he could not remember the exact amount of money he had given Mr. Sorensen. Even if he had remembered it was $14,000, as he now remembers that sum, Mr. Sorensen still had $1,700 in cash on his person and $510 in cash in his wallet—a total of $2,210 in cash—that Mr. Kuhnert's testimony did nothing to explain away.

Counsel was well within their professional judgment to decide that the money was only a drop in the bucket of the government's evidence and that calling Mr. Kuhnert to testify to the $14,000 loan would not have negated the overwhelming evidence against Mr. Sorensen. Counsel's judgment was also sound in believing Mr. Kuhnert's testimony may have harmed Mr. Sorensen by leading the jury to believe he had taken advantage of Mr. Kuhnert or that he and his lawyers were "grasping at straws." The court finds counsel's conduct was not deficient.

But Mr. Sorensen argues his counsel did not do a thorough investigation. He points out counsel did not document their pretrial interview with Mr. Kuhnert, they did not hire an investigator, and they did not do a criminal records check of Mr. Kuhnert. The court finds this argument misses the mark.

Even if Mr. Kuhnert had a spotless record and was a credit to his country in every way, the lawyers did not reject his testimony because they feared the jury would not find him credible. Rather, they felt the

15

evidence of the loan was marginal at best given the mountain of the government's evidence against Mr. Sorensen.  Also, they felt putting Mr. Kuhnert on the stand had the potential to backfire—the jury may have believed Mr. Kuhnert and thought Mr. Sorensen took advantage of him by using the loan money to buy drugs.

As the government countered at the evidentiary hearing in this matter, it is significant that Mr. Sorensen took the cash into Ms. Hartz's house with him where he was expecting to pick up the drugs.  If the money did not have anything to do with drugs, why not leave the cash in the vehicle along with the other $510 he left there?  A number of other questions might have been raised by Mr. Kuhnert's testimony.  If the bulk of the money came from Mr. Kuhnert, why did Mr. Sorensen combine the money with other funds and bundle it into three separate bundles?  Mr. Kuhnert allegedly loaned the money to Mr. Sorensen so Mr. Sorensen could pay Mr. Kuhnert's brother for automobile work—why didn't Mr. Kuhnert give the money directly to his own brother?  Why didn't Mr. Kuhnert write a check to his brother and give that to Mr. Sorensen?  The presentation of Mr. Kuhnert's testimony would not have "moved the ball down the field," in the words of Mr. Rivers, and had the potential to raise a host of other issues and questions that might not reflect well on Mr. Sorensen.  Counsel was acting as constitutionally effective counsel in making the decision not to present Mr. Kuhnert's testimony.

### b.    Prejudice

For the same reasons discussed above, the court concludes Mr. Sorensen cannot show prejudice.  Had Mr. Kuhnert testified, even if the jury did not impute any nefarious motives to Mr. Sorensen as a result of that testimony, there was still overwhelming evidence against Mr. Sorensen as discussed above.  All Mr. Kuhnert's testimony would have done is explained the presence of $14,000 in cash on Mr. Sorensen's person on the day of Mr. Sorensen's arrest.  His testimony would not have explained away the other $2,210[8] in cash Mr. Sorensen possessed that day.

Nor would Mr. Kuhnert's testimony have explained away Mr. Sorensen's text messages with Ms. Hartz about drug deliveries, his fingerprint on the tape on the package, his contact with the postal service checking up on the delivery of the package, his many trips to Arizona that coincided with multiple other packages mailed from Arizona to Ms. Hartz's residence, the significant amount of drugs found in Mr. Sorensen's vehicle[9], or the mailing labels and additional drug items found in his home.

---

[8] $1,700 on his person and $510 in his vehicle just outside Ms. Hartz's house.

[9] Police found 6 grams of marijuana, 1.10 grams of cocaine, 15.1 grams of methamphetamine, and 19.23 grams of psilocybin mushrooms inside Mr. Sorensen's vehicle.  CR Docket No. 100-1 at p. 33 (Trial Exhibit 37); Trial Exhibits 57-63.

Mr. Sorensen argues that the money *was* a significant part of the government's case and argues that countering even that one factor could have made a difference. The court disagrees. Not only was the money a very small part of the government's case, the government did not even mention the money in its initial closing argument. It was mentioned briefly in rebuttal closing argument, but the government did not argue the money in and of itself was damning. Instead, the government pointed to the totality of circumstances—all the pricey things Mr. Sorensen did and owned—and asked how he could legitimately have paid for all those things on a $773-per-month disability check. CR Docket No. 137-2 at p. 54 (JT Trnscpt Vol. III at p. 474). The cash in Mr. Sorensen's pocket was the least of his worries concerning the government's evidence against him.

There is no possibility that presenting Mr. Kuhnert's testimony might have changed the outcome of Mr. Sorensen's trial. Accordingly, the court recommends Mr. Sorensen's final remaining § 2255 claim be dismissed with prejudice.

## CONCLUSION

Based on the foregoing law, facts, and analysis, this magistrate judge respectfully recommends that the government's motion to dismiss [Docket No. 26] be granted and that Mr. Sorensen's last remaining claim for relief be dismissed with prejudice.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. See FED. R. CIV. P. 72; 28 U.S.C. § 636(b)(1)(B). Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Id. Objections must be timely and specific in order to require *de novo* review by the district court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED October 19, 2021.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

19